## BRUCE RAY SPELL *v.* STATE OF MARYLAND

[No. 381, September Term, 1968.]

*Decided June 3, 1969.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Leonard J. Harmatz* for appellant.

*Bernard L. Silbert, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Charles A. Herndon, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The question presented on this appeal is whether the confession of the appellant was properly admitted in evidence against him. The appellant, convicted at a court trial in the Criminal Court of Baltimore of three offenses of robbery with a deadly weapon and sentenced to a total of 15 years,[1] asks: "Was the atmosphere in which the interrogation took place, of such a character, as to justify the court in finding that a confession obtained under these circumstances was voluntary and that (he) knowingly and willingly waived his *Miranda* rights?"

About 9:00 P.M. on Friday, 1 December 1967 the appellant and a companion robbed a liquor store at 1800 Division Street. The appellant jumped over the counter and was rifling the cash register while his companion

---

1. He was sentenced under indictment No. 224 to 10 years under the jurisdiction of the Department of Correctional Services, under indictment No. 225 to 5 years to run consecutively with the sentence under No. 224 and under indictment No. 226 to 5 years to run concurrently with the sentence under No. 225.

held a gun at the head of the store clerk. When the man holding the gun turned his head to see what the appellant was doing, the clerk ducked behind the counter and using the appellant as a shield yelled, "Shoot him." The robber with the gun shot and hit the appellant in the left shoulder. Both robbers escaped. The police were informed that a man answering the description of one of the robbers had applied to the Johns Hopkins Hospital for treatment. Officer Richard M. Catania went to the hospital and the appellant gave his name and said that he had been shot in the 700 block of Catherine Street in an argument over a girl. There was no interrogation at that time. A check of police records disclosed that there was a warrant outstanding against the appellant for another crime and "we left a policeman there to guard him." The following Sunday "when we came back to work, we received word from Johns Hopkins that Mr. Spell wanted to talk to our sergeant." Lt. Judd, Sergeant Vogelsang and Catania went to the hospital, Catania testified that the appellant's sister, Gladys Aye, was present. He gave the appellant the *Miranda* warnings and Lt. Judd also gave them by reading from a *"Miranda* Card"—"we all carry these." The appellant was told (1) he had a right to remain silent; (2) if he chose not to remain silent, anything he said could and would be used as evidence against him in court; (3) he had a right to consult a lawyer before any questioning and a right to have a lawyer with him during any questioning; (4) if he lacked the financial responsibility to obtain a lawyer, a lawyer would be appointed to represent him before any questioning and he may have the appointed lawyer present with him during any questioning. "He was asked repeatedly if he understood, and he said yes, he did * * * He understood. We left his sister right there, so she would understand." No "coercion was applied" to the appellant, he was not "offered any rewards or immunity for saying anything," he was not "threatened in any way." On cross-examination Catania described the appellant's physical condition at the time:

"He was lying in the bed. He was—he didn't—he seemed to be a little uncomfortable. He was bandaged up, and the nurse was called in two or three different times to try to ease his—to ease him a little bit. He was a little uncomfortable, I believe."

The transcript continues as follows:

"Q  He was in pain?

A  Pain.

Q  Could you tell if he had been under any sedation?

A  I know he was under sedation.

Q  You knew he was under sedation?

A  To ease the pain, I imagine.

Q  Do you know how much sedation he was under?

A  No, sir.

Q  Did you check with the nurse to see how much dope he had in him—

A  No, sir.

Q  —or what kind of pills he had been given or anything like that?

A  No, sir.

Q  Well, did you check with the doctor or anyone at all?

A  We asked the nurse, but she kept on—we kept on going to get this nurse, because he yelled that he was in pain, and she said that she gave him everything that he could have. He can't have no more.

Q  He was doped up to the limit?

A  I don't know if that is the correct terminology. I think the answer to it is that she gave him what the doctor prescribed to give him.

Q  She couldn't give him any more?

A  She couldn't without the doctor's permission."

In answer to a question by the court whether the appel-

lant was conscious at all times while giving the statement or while he was talking to the police Catania said:

> "He was conscious and he was very alert. The only thing that I do say is that he was a little uncomfortable. That is the only thing that I did say about that."

Asked, other than that, whether the appellant knew what was happening, and answered the questions, the witness said, "Yes, sir."

The appellant testified on the issue of the voluntariness of his statement. He said the police came to the hospital and saw him on 1 December and 3 December. He denied giving an oral statement to the police. He was in "great pain" and had been given a "shot" every four hours in his shoulder. He was also given some pills. He was operated on shortly after going to the hospital; he had been given blood; he was very weak. He denied the police ever told him anything about his rights "prior to giving them a statement." Catania, a lieutenant and a sergeant came and asked questions while he was in the "overnight ward." His sister was there when the police came in. Catania told him to "tell him if I did do it, or if I did, tell him, and when they get me downtown it would be all just this one charge." He denied that the officers read anything to him and asked if he understood it until he was released from the hospital. On the Sunday the police came to see him he was still being given shots, was in pain and was weak. He had an "I.V." needle in his neck. Asked if he knew what the police were saying, he said, "Well, I understood them—I understood them not too good, because I * * * was in pain, and at the time when I was talking, each time I would breathe or say something to them, I would get an ache in my chest, in the side." The police called a nurse while they were there and she came in but did not then give him a shot. On cross-examination he again stated that he gave no statement at the hospital and said nothing at all—"I told them I didn't know anything about it." Questioned by the court

he said the police told him they wanted to talk to him about some robberies and that if he did those robberies and told about them, when "he got downtown, it would only be one charge" against him. The police did not say how many robberies he was supposed to have done, but asked if the police gave him the places or the persons he was supposed to have robbed, he said they "named about five" but he made no statement with respect to any of them. In rebuttal Catania denied that he or any officer in his presence had offered the appellant immunity from prosecution of other offenses if he gave a statement as to any one particular offense and offered him no immunity whatsoever. In answer to questions by the court Catania said they talked to him about other robberies—"I think six"—but specifically denied that he or anyone else told the appellant "that if he gave you a statement about the robberies, that when he got downtown, he would only have to face one charge." He was present at all times when the appellant was being questioned by him, by the lieutenant and by the sergeant. At this point the trial was continued to enable the defense to obtain the presence of the appellant's sister, Gladys Aye. The next day defense counsel reported that she was not present—"she says she is sick." The appellant's wife, Barbara Spell, testified on the issue. She said she saw the appellant in the hospital the day after he was shot. He was in "intensive care * * * he had tubes up his nose and his chest." She and Gladys Aye went to the hospital together in a cab the day after her husband was shot. About five or ten minutes later Catania, Sgt. Vogelsang and "another sergeant" came in. She heard the conversation:

> "They was over there asking him how many armed robberies he did and all that, and so he told them he ain't do—he ain't do no armed robberies, just like that. So they say, 'Come on, you got to come better than this. Tell me how many you did, and we'll drop it all down to one,' just like that."

She was there the entire time the police were there. She denied hearing the police say anything or read anything to the appellant before they started questioning him. She did not talk to her husband at any time because "he ain't feel like talking" but he was talking back to the police. "He was telling them he ain't—he ain't do no armed robberies, is all I heard him say." She went to the hospital every night while her husband was there. The only time she heard any discussion about robberies was the day after he was shot. The defense called Catania as its witness. He repeated that the statement was obtained on Sunday, two days after the appellant was shot. The appellant's wife was not present. Asked why the police went back to the hospital to see the appellant after the statement was obtained, the witness said: "Because Mr. Spell kept on sending messages over that he wants to see us. So we would go back. And, if you will let me get this in, I'll tell you why—Huh?" Defense counsel did not want the witness "to get it in." On cross-examination the witness said that the appellant had tubes up his nose during the questioning. He emphasized that the appellant was promised nothing. The court overruled the objection to the admission of the statement. It said:

> "Well, I have no difficulty in finding that he not only understood, but that he initiated the oral statement. I point out to you that it is uncontradicted in the evidence that Spell sent for the police.
>
> Now, he obviously was in good enough shape to call for them two days after this incident occurred. And there is nothing in the record to indicate that he did not, in fact, send for them.
>
> The Officer has been fair in saying that when he got there, the man had tubes in his nose, he was very uncomfortable, that he had been under sedation, but he also says that his rights were explained to him. When Spell was asked whether he understood what they told him about

his rights, he said he understood what the officer said, but not too good.

Now, I don't know what it means when you say you understand but not too good. He, apparently, understood enough and well enough to be able to say that they had made him a promise that if he would confess to the five robberies, that they would lump them into only one when they got downtown. There is nothing in his testimony to indicate that he did not know what was being said to him, or that he didn't understand what was being said to him.

And, certainly, there is not enough in this case to justify my finding, as a matter of fact, that he was not completely aware of what was going on at the time that this oral statement was made.

There is no evidence of any—of any coercion. There is no evidence of any effort to get a statement out of this man by trickery. As a matter of fact, the evidence in the case is that his sister was present at the time the statement was given. The evidence also is that the wife was brought to the hospital on several occasions, including the two that she talks about, and all of the—all of the background clearly indicates that this statement was voluntarily made by the defendant, after having been fully advised of his rights."

The statement came into evidence.

The trial of the case commenced on 7 November 1968, was not concluded, resumed on 8 November, was not concluded, and resumed on 14 November by agreement. On 14 November it was brought to the court's attention that Gladys Aye was available and that the defense desired the matter of the admissibility of the oral statement to be reopened. The court said that it had ruled on the question but "in fairness to you, I will hear from Miss

Aye and see whether it changes my opinion any." She testified that she went to the hospital to see her brother on a Tuesday night "and at that time they did not have a statement from my brother, because I was standing there listening at them when they was trying to get him to admit that they was calling out from a sheet of paper." The police told him that they were going to help him—they were going to put him in the hospital to help him" to get off narcotics. She left the room and was not present when any statement was given. The appellant asked the officers "could he talk in private, and for his sister to go out." Her testimony did not change the opinion of the court as to the admissibility of the statement.

Procedurally the lower court properly made a preliminary determination of whether or not the *prima facie* proof was such as to establish that the challenged confession was freely and voluntarily made. See *Barnhart v. State*, 5 Md. App. 222; *Sims v. Georgia*, 385 U. S. 538. Substantially, in deciding that the confession was admissible it applied the basic rule that a confession is admissible if it is voluntarily made, that is, that it cannot be extracted by any sort of threats or violence, nor obtained by any direct or implied promises nor by the exertion of any improper influence, on which basic rule have been impressed the holdings of *Escobedo v. Illinois*, 378 U. S. 478 and *Miranda v. Arizona*, 384 U. S. 436. See *Dennis v. Warden*, 6 Md. App. 295. In the application of the rule, the court made factual findings on the evidence before it: that the warnings required by *Miranda* had been given (the appellant specifically raises no issue as to this finding) ; that the appellant initiated the oral statement (it was uncontradicted that the appellant sent for the police and nothing in the evidence showed that he did not in fact send for them) ; that on the conflicting evidence as to the alleged promise or inducement, it is inherent in the finding of the court that it found that no promise or inducement had been made; that no improper influence had been exerted ("there is no evidence of any effort to get a statement out of this man by trickery") ; that it was

not extracted by any sort of threats or violence ("there is no evidence of any coercion") ; that the evidence was not sufficient to show that "he did not know what was being said to him or that he didn't understand what was being said to him 'or that' he was not completely aware of what was going on at the time that this oral statement was made." We cannot say that the judgment of the trial court on the evidence—"all of the background clearly indicates that this statement was voluntarily made by the defendant, after having been fully advised of his rights"—was clearly erroneous. The determination of admissibility of a confession is left largely to the trial court and we find no manifest abuse of discretion, absent which, such determination will not be disturbed. *Cooper v. State,* 1 Md. App. 190. See *Bryant v. State,* 229 Md. 531; *Campbell v. State,* 240 Md. 59; *Robinson v. State,* 3 Md. App. 666. In so concluding we have considered the requirement of an effective waiver by the appellant of his rights encompassed in the *Miranda* warnings.[2] We find that the appellant waived the rights in view of the absence of an allegation of mistreatment, the evidence in rebutting the alleged promise, the testimony that he "was asked repeatedly if he understood, and he said yes, he did * * * He understood" and that the interrogation was undertaken at the appellant's own initiation. See *Anderson v. State,* 6 Md. App. 688, *Miller v. State,* 251 Md. 362.

*Judgments affirmed.*

---

2. *Miranda v. Arizona, supra,* at 475 makes clear that, if after the constitutional warnings required have been given, custodial interrogation is undertaken without the presence of an attorney and a statement is taken, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel."