834 A.2d 975

Nickolas PANTAZES

v.

STATE of Maryland.

No. 2731, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Oct. 30, 2003.

Fredric J. Einhorn of Rockville, for appellant.

Melissa S. Whipkey, Staff Attorney (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before SALMON, KENNEY and CHARLES E. MOYLAN, J. (retired, specially assigned), JJ.

MOYLAN, Judge.

If we were to "buy into" the perspective of the appellant/bail bondsman, to wit, that he is simply an ordinary plaintiff (or ordinary defendant) involved in a legal "tussle" with the State over the entitlement to $10,000, his contentions might well have at least a surface plausibility. The very fact of bringing

this appeal, however, betrays his fundamental failure to understand just how peripheral his role, as a bondsman, is and how almost coincidental his interests are in what is, at a more elemental level, quintessentially a struggle between the State and an absconding criminal defendant. This transcending reality will be explored more fully as the opinion develops.

### A Defendant Jumps Bail

Jose W. Orellana, who is not a direct party to this appeal, was indicted on February 24, 2000, by the Grand Jury for Montgomery County on charges of child abuse and two counts of second-degree sexual offense. On March 3, he was released on bail on the basis of a $10,000 bail bond, guaranteeing his appearance in court, posted on his behalf by the appellant, Nickolas Pantazes, a licensed "bail bondsman" and surety as defined by Maryland Rule 4–217(b)(2) and (6). On April 12, 2001, Orellana was tried and convicted of child abuse and one count of second-degree sexual offense. His bail was continued pending sentencing, which was set for July 10, 2001. On July 10, Orellana failed to appear. The trial judge ordered the bail "revoked" and issued a warrant of arrest for Orellana.

The problem that has given rise to this case is that, although the trial judge on July 10 "revoked" Orellana's status as someone free on bail, he did not formally "forfeit" the bond. The precondition for a forfeiture, however, had been fully satisfied. Maryland Rule 4–217(f) provides:

(f) **Condition of bail bond.** *The condition* of any bail bond taken pursuant to this Rule *shall be that the defendant personally appear as required in any court in which the charges are pending* or in which a charging document may be filed based on the same acts or transactions, or to which the action may be transferred, removed, or if from the District Court, appealed, and that *the bail bond shall continue in effect until discharged pursuant to section (j) of this Rule.*

(Emphasis supplied). When Orellana failed to appear for sentencing, therefore, subsection (i)(1) potentially came into play:

(i) **Forfeiture of bond.** (1) On defendant's failure to appear—Issuance of warrant. *If a defendant fails to appear as required, the court shall order forfeiture of the bail bond and issuance of a warrant for the defendant's arrest.* The clerk shall promptly notify any surety on the defendant's bond, and the State's Attorney, of the forfeiture of the bond and the issuance of the warrant.

(Emphasis supplied).

When a forfeiture is ordered, however, the surety is given a 90–day period of grace, following prompt notice of the forfeiture, in which to produce the defendant in lieu of having the bond forfeited. Subsection (i)(3) provides:

(3) Satisfaction of forfeiture. *Within 90 days ... a surety shall satisfy any order of forfeiture,* either *by producing the defendant in court* or by paying the penalty sum of the bond. If the defendant is produced within such time by the State, the court shall require the surety to pay the expenses of the State in producing the defendant and shall treat the order of forfeiture satisfied with respect to the remainder of the penalty sum.

(Emphasis supplied)

### Albeit Not Promptly, the Bond Was Forfeited

Ultimately recognizing that the earlier "revoking" of Orellana's bail status did not qualify as a legally effectual forfeiture of the bail bond, Administrative Judge Paul H. Weinstein took corrective action on March 28, 2002. He called the case and, Orellana still being among the missing, ordered that the bond be forfeited *nunc pro tunc* as of July 10, 2001. The full panoply of procedural safeguards was extended to the appellant on March 28. A formal Notice of Forfeiture of Bond was given to him. That is not disputed. The appellant was then given 90 days from April 1, 2002, within which, pursuant to subsection(i)(3), to satisfy the forfeiture. That is not disputed.

On April 26, the appellant filed a Petition to Strike Purported Forfeiture. On May 20, Judge Weinstein denied the petition, stating in his Order that he would "reconsider if the

defendant was produced as promised by the surety." Judgment absolute was entered against the appellant for $10,000 on December 4, 2002. On December 12, the appellant filed a Motion for Reconsideration. On December 19, Judge Weinstein denied that motion, stating in his Order:

"When the defendant failed to appear for sentence the bond should have been forfeited. The surety cannot escape its obligations to the Court even if the Judge revoked the bond. That does not cancel the surety's obligation."

This appeal is from that judgment.

### A Tardy Forfeiture Is Not Invalid

The appellant's primary argument is that Maryland Rule 4–217(i) contemplates that, upon a defendant's failure to appear in court, the bond should be forfeited promptly. *Wiegand v. State*, 112 Md.App. 516, 521, 685 A.2d 880 (1996) fully agrees, as do we, with that interpretation.

Rule 4–217(i) commences with the requirement that, if a defendant fails to appear, the court shall order forfeiture of the bond. *Although,* as the State argues, *the rule does not set a specific time for the court to enter such an order, common sense would dictate that the order be entered very promptly.*

(Emphasis supplied). The bond should, indeed, have been forfeited promptly after Orellana's non-appearance. It was not.

The *Wiegand* opinion also, however, then goes on to consider what the legal consequences are if and when forfeitures are not, as contemplated by the rule, ordered promptly following the non-appearance of defendants. Judge Wilner, 112 Md. App. at 518, 685 A.2d 880, posed the question before the Court:

This case is before us because of a regrettable series of lapses and errors on the part of both the court and the clerk. *The question is the effect of those lapses and errors.*

(Emphasis supplied). That is precisely the question before us.

█ In both this case and in *Wiegand,* there were no effective forfeitures of bail bonds promptly ordered following

the non-appearance of defendants. In this case, the critical non-appearance of the defendant was on July 10, 2001. There was no effective forfeiture on that date, however, because the court "revoked" the bail rather than "forfeited" the bond. In the four separate cases dealt with by the *Wiegand* opinion, it was "a regrettable series of lapses and errors on the part of both the court and the clerk," 112 Md.App. at 518, 685 A.2d 880, that invalidated the ostensible orders of forfeiture. "The State rightly concedes that these initial orders did not constitute effective orders of forfeiture." 112 Md.App. at 522, 685 A.2d 880.

In the *Wiegand* case, as in this, corrective measures, albeit delayed, were then taken to rectify the earlier lapses.

Sometime in 1995, it came to light that the defendants had not been produced and that no money had been paid on the bonds. On September 5, 1995, *in an effort to correct the problem, the court issued new forfeiture orders in the four cases.* Unlike the earlier procedure, the court actually issued a written order in each case "that the bond in the above named matter be forfeited"; the docket entry reflects that disposition through the notation: "Order to forfeit bond." The clerk then mailed a copy of each of the four orders to appellant on September 11, 1995.

112 Md.App. at 519–20, 685 A.2d 880 (emphasis supplied).

The appellant's central complaint is that Judge Weinstein's belated forfeiture of March 28, 2002, was prejudicial to him because it came 264 days after the defendant's non-appearance on July 10, 2001. In *Wiegand,* for purposes of comparison, there had been four non-appearances of defendants followed by what were held to have been ineffective forfeiture orders. The corrective action on September 5, 1995 in that case came 1) 411 days, 2) 593 days, 3) 629 days, and 4) 656 days after the various defendants' respective non-appearances of 1) July 21, 1994; 2) January 20, 1994; 3) December 15, 1993; and 4) November 18, 1993. What was, in the light of those protracted delays, "the effect of those lapses and errors"?

As to whether even those longer delays, all significantly longer than that in this case, should have foreclosed the court from taking the corrective measure of ordering proper, even if belated, forfeitures, Judge Wilner's opinion held emphatically that they should not.

> *The fact that the court did not enter an effective order of forfeiture promptly should not, and, in our view, does not, of itself, preclude further proceedings to forfeit and collect on the bonds.* The requirement of bail bonds, secured by collateral or the undertaking of a surety, is a vital part of our core commitment to avoid, whenever possible, the pretrial detention of accused persons. Whether the accused himself, his family or friends, or a paid surety secures a bail bond, it is the credible threat of a real pecuniary loss that tends to assure the defendant's appearance in court; at least that is the assumption that necessarily underlies the use of secured bonds as an alternative to detention. *To adopt an approach that would require the automatic release of collateral or a surety's obligation simply because the court or a clerk does not enter a proper forfeiture order precisely as the rule requires would not only severely undercut that premise but could, in addition, prove fertile ground for the worst kinds of collusion and improprieties between obligors and court personnel.*

112 Md.App. at 523–24, 685 A.2d 880 (emphasis supplied).

It is the dispositive lesson of *Wiegand* that the fact that the trial court in this case "did not enter an effective order of forfeiture promptly" on July 10, 2001, or shortly thereafter, "does not, of itself, preclude further proceedings to forfeit and collect on the bonds," 112 Md.App. at 523, 685 A.2d 880.

### The Appellant Fully Enjoyed

### His Procedural Grace Period

▉ The appellant in this case, moreover, unlike the appellant in *Wiegand,* actually received the full benefit of the 90–day grace period afforded him by Rule 4–217(i)(3) within which to "produce the defendant in court." Although the

literal wording of that subsection measures the surety's 90–day grace period "from the date the defendant fails to appear," the *Wiegand* opinion pointed out that the literal application of that measuring rod would be unfair in a case, such as this case or *Wiegand*, in which the forfeiture had not been timely ordered.

> That section allows a surety to satisfy an order of forfeiture, by producing the defendant in court or paying "the penalty sum of the bond" *within 90 days "from the date the defendant fails to appear."* In the ordinary case, of course, that time requirement works quite well. It assumes that the court and the clerk have complied with their duties under the rule by promptly entering an order of forfeiture and notifying the surety of that order. *Where the effective order of forfeiture is not entered promptly, however, that provision cannot operate as intended.*

112 Md.App. at 524, 685 A.2d 880 (emphasis supplied).

> *Wiegand* held that the only fair way to measure the 90–day grace period in the case of a tardy order of bond forfeiture would be to begin the count as of the date of the "late-filed order of forfeiture."

> *The only sensible way* to do that in this case *is to construe the time period* specified in Rule 4–217(i)(3) *as commencing on the date the late-filed orders of forfeiture were actually entered.* We can think of no other approach—and none has been suggested to us—that would better effectuate what we believe was the Court's intent.

112 Md.App. at 525, 685 A.2d 880 (emphasis supplied).

In this case, the "late-filed order of forfeiture" was made on March 28, 2002. Although the order of forfeiture was dated *nunc pro tunc*, the starting date for counting the 90–day window for production was not. Judge Weinstein gave the appellant 90 days to produce the defendant counting from April 1. The appellant was not in any way short-changed procedurally.

### Did a 264–Day "Head Start"

### Produce A Mission Impossible?

In a variation on the theme of his earlier primary contention, the appellant additionally argues that he should be excused from the forfeiture because the court's tardiness in ordering the forfeiture severely handicapped his efforts to locate the defendant. His argument is that the "trail" that might still have been fresh on July 10, 2001, had, by March 28, 2002, turned inscrutably cold. He argues that it is unfair to expect him to produce a defendant after the State's dilatoriness gave the fugitive a 264–day "head start."

Interestingly, the appellant proffered nothing to Judge Weinstein (nor to us) as to what measures he had taken prior to trial to monitor Orellana's movements or to supply himself with a list of possible contacts in case the defendant disappeared. See *Tyler v. Capitol Indemnity Ins. Co.*, 206 Md. 129, 135, 110 A.2d 528 (1955). Although Rule 4–217(i)(2) allows a surety to "show reasonable grounds for the defendant's failure to appear," the appellant offered no information as to what steps he took after Orellana's disappearance to locate him through relatives, through friends, through employment, through automobile registration, through telephone usage, through credit cards, etc. He does not suggest what heightened security measures were taken after Orellana was convicted but nonetheless remained on bail pending sentencing. *Allegheny Mutual Casualty Co. v. State*, 35 Md.App. 55, 57, 368 A.2d 1032 (1977) ("[T]he burden of demonstrating the good cause is upon the surety."). Nor does he suggest that he ever "hired a bounty hunter to apprehend" Orellana, as discussed in *Harcum v. State*, 121 Md.App. 507, 515, 710 A.2d 358 (1998). The appellant simply serves up the truism that a trail is not as fresh on the 264th day as it was on the first day.

That is self-evidently true, but the recovery mission in this case was not nearly as daunting as that in *Frank v. State*, 99 Md.App. 227, 636 A.2d 484 (1994). In that case, Frank appealed the forfeiture of two $100,000 bonds after two defendants failed to appear for trial. Frank "made diligent efforts

to locate the defendants," 99 Md.App. at 229, 636 A.2d 484, including two trips to Haiti. The two defendants had fled to Haiti and extradition efforts, pursued by Frank, were "unsuccessful because the United States and Haiti had no diplomatic relations following the ouster of Haiti's President." 99 Md. App. at 229–30, 636 A.2d 484. This Court rejected Frank's argument that the "impossibility" of producing the defendants absolved him from the forfeiture of the bonds.

We reject appellant's contention that the circuit court should have stricken forfeiture of the bonds because it was impossible to produce the defendants. *The purpose of a bail bond system is to insure that the party accused is present at trial.*

99 Md.App. at 231, 636 A.2d 484 (emphasis supplied).

Judge Wenner explained our holding more fully, 99 Md.App. at 232, 636 A.2d 484.

We note that in the typical contract case, the promisor may not rely on the defense of "impossibility" as an excuse for non-performance if the promissor assumed the risk. In the cases at hand, *the bonds securing the defendants' appearance were conditioned upon their appearance for trial. Consequently, appellant assumed the risk that the defendants would not appear.*

... *The defendants voluntarily fled the country. Appellant insured against that flight, and must now suffer the consequence.*

(Emphasis supplied). In the very words of *Frank,* Orellana in this case "voluntarily fled" the jurisdiction of the court. The "appellant insured against that flight, and must now suffer the consequence."

In the *Frank* opinion, 99 Md.App. at 232–33, 636 A.2d 484 we quoted with approval from *State v. Ohayon,* 12 Ohio App.3d 162, 467 N.E.2d 908, 911–12 (1983):

*The escape of a defendant is the business risk of a bail surety. It is precisely the situation which a surety guarantees against.* Appellant insured the risk by securing property of the defendant. The fact that appellant is now unable

to deliver the defendant or fully collect on his collateral will not shift the risk to the obligee. We hold, therefore, that *it is an insufficient defense in a bond forfeiture proceeding that appellant is unable to produce the defendant* due to foreign policy decisions *when the defendant voluntarily fled* the country prior to his initial court appearance date.

(Emphasis supplied). The absconding by Orellana was "the business risk" of the appellant. It was "precisely the situation which [the appellant] guarantee[d] against."

To strike the forfeiture of the bond in this case would actually be a disincentive for the appellant to continue the search for Orellana. As *Frank v. State* further observed, 99 Md.App. at 231, 636 A.2d 484:

[I]f the circuit court had stricken forfeiture of the bonds it would not only have undermined the system, but as appellee points out, *appellant would have no incentive to continue to seek extradition of the defendants* upon restoration of diplomatic relations between the United States and Haiti.

(Emphasis supplied).

The proper time for the appellant here to seek some relief, total or partial, from the forfeiture will be when he locates Orellana and returns him to the Circuit Court for Montgomery County for sentencing. It was he who guaranteed Orellana's appearance and that obligation continues until Orellana is produced.

### The "Revoking" of a Defendant's Release Status

### Does Not Terminate the Bond

The appellant, somewhat hesitantly, contends that when the trial judge on July 10, 2001 said, "I revoke the bond," those words had the necessary legal effect of discharging the bond and rendering any subsequent ostensible "forfeiture" a nullity, because there was no longer any bond to be forfeited. A sane reading of what occurred on July 10, however, makes it transparently clear that that is not what happened.

The word "revoke" does not necessarily mean "forfeit," but neither does it necessarily mean "discharge." In the circumstances of Orellana's non-appearance, the trial judge's intended meaning when he "revoked" the bond was beyond the shadow of a doubt closer to "forfeit" than it was to "discharge." The trial judge may have said "revoke" when he should have said "forfeit," but the question remains of what was actually being "revoked?" When Orellana failed to appear for his scheduled sentencing, the judge unquestionably "revoked" his status of being free on bail and directed that a warrant be issued for his immediate arrest. That is all that happened.

When Orellana was allowed to remain free on bail following his conviction on April 12, 2001, that was done pursuant to Maryland Rule 4–349(a), which provides in pertinent part:

> (a) **General authority.** *After conviction the trial judge may release the defendant pending sentencing* ... subject to such conditions for further appearance as may be appropriate.

(Emphasis supplied).

Subsection (c) outlines the conditions for such post-conviction, pre-sentence release, as it provides in pertinent part:

> (c) **Conditions of release.** ... *When the defendant is released pending sentencing, the condition of any bond* required by the court *shall be that the defendant appear for further proceedings as directed* and surrender to serve any sentence imposed.... *The bond shall continue until discharged by order of the court or until surrender of the defendant,* whichever is earlier.

(Emphasis supplied).

When following that pre-sentence release, Orellana failed to appear on July 10, the trial judge "revoked" the release, as he was authorized to do by subsection (d), which provides in pertinent part:

(d) **Amendment of order of release.** *The court* ... on its own initiative ... *may revoke an order of release.* (Emphasis supplied).

The docket entries of July 10, 2001, "REVOKES BOND. ORDERS WARRANT. DEFENDANT TO BE HELD WITHOUT BOND," clearly refer to the custodial status of Orellana and not to the discharge of the surety from any further financial obligation under the bond.

The provisions of the Bail Bond itself, moreover, included the following proviso:

IT IS AGREED AND UNDERSTOOD that this bond shall continue in full force and effect until discharged pursuant to Rule 4–217.

There unquestionably was never a "discharge" of the bond pursuant to the provisions of Rule 4–217(j), which prescribe the limited circumstances in which such a discharge is permitted:

(j) **Discharge of bond—Refund of collateral security.** (1) Discharge. The bail bond shall be discharged when:

(A) all charges to which the bail bond applies have been stetted, unless the bond has been forfeited and 10 years have elapsed since the bond or other security was posted; or

(B) all charges to which the bail bond applies have been disposed of by a nolle prosequi, dismissal, acquittal, or probation before judgment; or

(C) the defendant has been sentenced in the District Court and no timely appeal has been taken, or in the circuit court exercising original jurisdiction, or on appeal or transfer from the District Court; or

(D) *the court has revoked the bail bond pursuant to Rule 4–216* or the defendant has been convicted and denied bail pending sentencing; or

(E) the defendant has been surrendered by the surety pursuant to section (h) of this Rule.

(Emphasis supplied).

Only subsection (D) has conceivable pertinence. There is nothing in Rule 4–216, however, which would authorize a discharge of the bond obligation in this case. Subsection 4–216(k), the only subsection with remote pertinence, deals only with the issuing of a bench warrant for arrest following a defendant's non-appearance and the subsequent "revok[ing of] the defendant's pretrial release" after the missing defendant has been taken into custody and is then "presented before a court." In short, the bond in this case was never discharged. It was, therefore, still subject to forfeiture on March 28, 2002.

## Taking Another Look at this Case—

### In Macrocosm

Assuming, *arguendo*, the appellant's status as a full-fledged and legitimate litigant on this bail bond forfeiture, we are fully satisfied that we have responded adequately on the merits to each of his contentions. What remains troubling is the nagging sense that we may have given him far more than he deserved, and that this could be taken as a precedent for future entitlements to litigate under similar circumstances. We would like to stand back and try to see the case in longer focus.

■ The appellant presumes to treat the bail bond as essentially a contract between the State and the bail bondsman, and not as an agreement that is more fundamentally one between the State and the defendant. The appellant presumes that every required or recommended procedure spelled out by the Maryland Rules is a condition of the contract designed somehow for the protection of the bail bondsman. He presumes to treat every procedural lapse by the State as a "breach of contract" exempting him from suffering a forfeiture of the bond. A sample paragraph of the appellant's brief is redolent with this presumed contractual status.

> *As a contract, the Bond imposed duties on Appellant and the State.* A material duty of the State under the Bond was to forfeit the Bond "forthwith" if Defendant failed to perform the "foregoing condition" of personally appearing "as required". *Appellant had a right to rely on the State performing that material duty under the Bond, a duty which only the State could perform. By failing to forfeit the Bond "forthwith"* on July 10, 2001, when Defendant failed to perform the "foregoing condition" of personally appearing "as required", *the State breached that material duty under the Bond and thereby prejudiced Appellant* in any subsequent attempt to apprehend Defendant. *Once the State has so prejudiced Appellant's ability to perform, the State cannot be heard to impose liability under the Bond for Appellant's failure to perform* the very duty that the State, by its own breach of a material duty, prejudiced Appellants' ability to perform.

(Emphasis supplied).

The appellant presumes too much significance for the relatively peripheral role he plays. The hardest thing for him to grasp is that the case is not really about him. The very concept of professional bail bond is only a latter-day wrinkle on a far more basic phenomenon that predates by centuries the first appearance of the first bail bondsman. Two competing and very legitimate social interests were in conflict. On the one hand, there was a strong social interest in not subjecting to undue pretrial detention accused persons who were still presumed to be innocent. On the other hand, there was also a strong social interest in guaranteeing that defendants would show up for trial and, if convicted, for sentencing.

Among the ways devised to accommodate those competing interests was the requirement that a defendant post collateral to guarantee his appearance in court. If the defendant failed to appear, the collateral was forfeited. The amount of the collateral was theoretically fixed at the point where the risk of losing money or property was equal to or greater than the risk of suffering an adverse verdict. As Maryland Rule 4–217(b), "Definitions," now recognizes, the "bail bond" is the "written

obligation of a *defendant* " to appear in court as required, lest he lose his bond or collateral. Subsection (b)(1) defines "bail bond."

*"Bail bond" means a written obligation of a defendant, with or without a surety or collateral security,* conditioned on the appearance of the defendant as required and providing for the payment of a penalty sum according to its terms.

(Emphasis supplied).

The collateral posted by or on behalf of a defendant is defined by subsection (b)(5).

"Collateral security" means any property deposited, pledged, or encumbered to secure the performance of a bail bond.

Over the course of time, the practice developed that collateral might be posted for a defendant by a relative or friend or other accommodation surety. That such accommodation sureties might be uncompensated is recognized by subsection (b)(6).

*"Surety"* means a person other than the defendant who, by executing a bail bond, guarantees the appearance of the defendant and *includes an uncompensated or. accommodation surety.*

(Emphasis supplied).

As the practice of posting collateral to guarantee one's appearance further developed, defendants arranged to procure professional insurers, or bail bondsman, to post collateral for them for a price. Subsection (b)(7) recognizes the phenomenon.

"Surety insurer" means any person in the business of becoming, either directly or through an authorized agent, a surety on a bail bond for compensation.

In any of its manifestations, it is still *the defendant* who has, directly or indirectly, put up collateral to guarantee his appearance. In *Wiegand,* 112 Md.App. at 523, 685 A.2d 880, Judge Wilner referred to the fact that the posting of the

collateral may be by "the accused himself, his family or friends, or a paid security."

> *Whether the accused himself, his family or friends, or a paid surety secures a bail bond, it is the credible threat of a real pecuniary loss that tends to assure the defendant's appearance in court;* at least that is the assumption that necessarily underlies the use of secured bonds as an alternative to detention.

(Emphasis supplied).

At the most basic level, *the fate of the collateral depends upon the behavior of the defendant,* not upon the behavior of any third person, be that third person an accommodation surety or a professional "surety insurer." Although, to be sure, subsections (i) and (j) provide some procedural protections for both accommodation sureties and professional bail bondsmen, the primary focus remains at all times fixed on the defendant. The critical act that triggers forfeiture is the behavior of the defendant in failing to appear in court when required. The focus is not on the behavior of the surety or on the behavior of the State as it may affect the surety.

The bail bondsman is not without some coincidental interest in a forfeiture, but he must not be allowed to exaggerate that interest. The forfeiture of collateral remains, at its root, a matter between the State and the defendant, not a matter between the State and the bail bondsman. The forfeiture of a bond is not a punishment for the bail bondsman. It is no more than a continuing incentive to have him find the defendant and return him to the jurisdiction of the court. As Chief Judge Orth observed for this Court in *Irwin v. State,* 17 Md.App. 518, 524, 302 A.2d 688 (1973):

> The purpose of the bond or security is to secure a trial, its object being to combine the administration of justice with the convenience of a person accused, but not proved, to be guilty. *If the accused does not appear the bail may be forfeited, not as a punishment to the surety* or to enrich the Treasury of the State, *but as an incentive to have the*

*accused return or be returned to the jurisdiction of the court.*

(Emphasis supplied). See also *Frasher v. State,* 8 Md.App. 439, 445, 260 A.2d 656 (1970).

Even in the rare cases in which a forfeiture has been stricken for some reason other than the actual return or surrender of the fugitive defendant, the focus has remained fixedly on the whereabouts and the availability of the defendant. Both Criminal Procedure Article, § 5–208(b)(1) and Maryland Rule 4–217(i)(2) speak of showing "reasonable grounds for the defendant's failure to appear." In *Irwin v. State, supra,* the incarceration of the missing defendant in another state was held to constitute such "reasonable grounds." See also *Allegheny Mutual Casualty Co. v. State,* 234 Md. 278, 199 A.2d 201 (1964).

In the entire discussion of the possible striking of a forfeiture, however, the exclusive predicate of the phrase "reasonable grounds" is, as the statute and the rule expressly declare, the "defendant's failure to appear." The "reasonable grounds" defense has nothing to do with the "good faith" efforts of the surety to locate the defendant or with the purported obstacles placed in the path of that effort by any errors or lapses on the part of the judicial system.

In this case, the appellant did not at any time even make an offer to "show reasonable grounds for the defendant's failure to appear." All he attempted to show was a reason why he had been unable to locate the defendant, and that, we repeat, is not a legally cognizable reason for striking a forfeiture. The only question that matters is, "Why isn't the defendant here?" The question, "Why haven't you been able to locate him?" is immaterial. The law's exclusive concern is with the defendant, not the defendant's surety.

It is this primary focus that the appellant has missed. It is this primary focus that we are striving to keep in the center of the picture. The case was not about Nicholas Pantazes and whether he deserved to lose $10,000. It was about Jose W. Orellana and whether he forfeited the $10,000 collateral that

he had had posted on his behalf. The sanction of losing the collateral was imposed on Orellana, not on the appellant. The appellant was simply Orellana's insurance agent, who took a calculated gamble on Orellana's appearance and lost.

We have taken this second look at our decision from a longer viewpoint (and this may help in putting future bail forfeiture cases in proper perspective) in order to stress the point that the appellant was not the leading character in this loss of forfeited collateral but only a supporting actor. His problems and his reactions to them were not the central plot, and we must constantly guard against being distracted by a sideshow.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**