## GOURKO *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF ARKANSAS.

No. 972. Submitted November 17, 1893. — Decided April 16, 1894.

A person who has an angry altercation with another person, such as to lead him to believe that he may require the means of self-defence in case of another encounter, may be justified, in the eye of the law, in arming himself for self-defence; and if on meeting his adversary, on a subsequent occasion, he kills him, but not in necessary self-defence, his crime may be that of manslaughter or murder, as the circumstances, on the occasion of the killing, make it the one or the other.

If, looking alone at those circumstances, his crime be that of manslaughter, it is not converted into murder by reason of his having previously armed himself.

THE plaintiff in error, a white man and not an Indian, was charged by indictment in the Circuit Court of the United States for the Western District of Arkansas with the crime of having, on the first day of November, 1892, at the Choctaw Nation, in the Indian Territory, within the above District, feloniously, wilfully, and with malice aforethought killed and murdered one Peter Carbo. A verdict of guilty was returned, and, a motion for a new trial having been overruled, the defendant was adjudged to suffer death. The present writ of error brings up that judgment for review.

John Gourko and his brother Mike Gourko, and the deceased Peter Carbo, all of Polish nativity, were engaged as laborers at certain coal mines in the vicinity of the town of Alderson, Choctaw Nation, Indian Territory. Between Carbo and the Gourko brothers — the two latter being respectively about 19 and 17 years — there was considerable ill feeling, growing out of a charge made by the former that the latter had clandestinely appropriated for their benefit money due for the taking out of several lots of coal that he claimed to have dug, and with the taking of which from the mines they had no connection. Although the Gourko brothers denied this charge, Carbo

persisted in repeating it, and, according to the testimony of the younger Gourko, threatened to kill them both and "to shoot John like a dog." Carbo was about 40 or 45 years of age, weighed about 200 pounds, possessed extraordinary physical strength, and was regarded as a dangerous character. The defendant was in delicate health, weighed about 135 pounds, and was deemed a quiet, peaceable boy.

On the morning of November 1, 1892, — that being a holiday for the Polish laborers, — there were quite a number of miners in the town of Alderson. About nine o'clock Carbo and the defendant were observed to be engaged in an angry conversation near the post office.

The postmistress at Alderson, describing what occurred, testified that Carbo would swear and call Gourko "names and make threats that he would hit him or something of the kind, and shook his fist right in his face." Being afraid that Carbo was "going to hurt the boy," she spoke to Mr. Anderson, who was working in the store, and said, "'Pete is going to kill John, I am afraid.' . . . The boy did not show any disposition to want to quarrel with him or want to fight; he would step back as much as two or three steps away, and Pete would follow him up and shake his fist in his face, and the boy went on; and as he came back I spoke to John the defendant, and asked him not to have any trouble there by the office, and he said he wasn't going to; he said 'I have just gone to get a marshal to come and have him arrested,' and he said, 'I will wait until the marshal comes home.'"

Another witness, John Silluski, also a Polander, gave this account of the meeting between the deceased and the defendant near the post office: "That day was a holiday, the first of the month of November, and on this holiday all Poles stay at home; I staid at home too. John Gourko was sick. He worked a couple of days, and staid at home three or four; I don't know how many. On that day I staid at home and he staid at home too. He felt bad on that day. About 9 o'clock or half-past 9 I go to the post office, and John Gourko too, and Pete Carbo was standing in front of the post office, and three other men were standing there, and he was talking to

them, and I passed him and went inside of the post office. I heard John say, 'Pete, how many cars of coal do you say I stole from you?' and Pete say, 'I don't say you stole; you and your brother together work at that place, and I lost about six cars.' John wasn't mad that time. Pete said he stole about six cars. John left home that morning, he did; he wasn't well; he was sick, didn't work; he had chills and fever; was sick all the time. John said, 'You old sucker, I never stole no six cars of coal.'" Being asked what next happened, the witness stated that Carbo "cursed Gourko all the time," applying to him epithets of the most degrading kind, and which need not be here repeated. The witness further said: "And Pete said, 'You want to fight this morning. Come on here,' and John said, 'I don't want to fight; I am a sick man; I am going to arrest you; I don't feel well.' And he said, 'Come on and fight if you want to fight this morning,' and he said, 'I don't want to fight.' John looked behind the store for a policeman or something; he wanted to arrest him, I guess; I don't know."

It appears from the evidence that the killing occurred about twenty or thirty minutes after the difficulty at the post office, and near a saloon in which a billiard table was kept. The witness who gave the fullest account of the difficulty up to the time of the killing was Mr. Anderson. He testified, in substance, that he saw the beginning of the trouble in front of the post office, in which was the store where he worked. Being asked to state what occurred, he said: "Well, I was in the store there, and, as usual, around the post office there was a crowd gathered there for the mail, at distributing times, and other times men congregate around in front of the store and in the store, and this morning, which was the morning of the first of November, 1892, there was quite a crowd gathered right in front of the window and door of the store or post office, and it was not long until my attention was called to the loud talking out there by the postmistress. . . . The man who was doing the loud talking was Peter Carbo, the man who was killed. He appeared at that time to be angry, and was talking pretty loud when I first saw him. I heard him

talking there before I got in position where I could see him. I saw him then quarrelling with John Gourko; . . . and I seen Peter Carbo shake his fist at John, and putting his fist up under his nose, and using considerable bad language. . . . I heard him say that frequently, several different times, and John Gourko there, when he would be shaking his fist at him he would be stepping back, backing away. I seen him back as far as from here to you, and pass around the crowd. And it would only be a few minutes until Peter would be there. Q. Peter would follow him up? A. Yes, sir. And in the interval he would sometimes have one hand in his bosom and the other hand behind him. Of course, I didn't know whether he was armed or not. I stood in the store where I belonged, and after a little while the disturbance out there ceased, and they separated, and then in a few minutes after that, just a short space of time, I don't know just how long, Mr. Gourko there came back to the store, and the postmistress spoke to him, called him in and had a talk with him, and told him she didn't wish any more trouble. And I was speaking to Mr. Gourko there, as I was acquainted with him, and told him that the postmistress didn't want any more trouble in front of here, in front of her window, and no more such language as that was; and I told him to keep away from Peter Carbo, and have no more trouble with him. I also asked him if he was armed, and he said he was not. And presently — just about that time — there was a customer come in, and I had to leave him and go back to my work, and after I went back to my work, waiting on the customers, I can't tell how long that was, but I got through the customers, and I happened to walk to the store door, and I leaned up against the side of the door, and was standing there, and presently I saw Mr. Gourko there coming right to me from behind the billiard hall, that was in front and to the right of me, right across the street or passageway; he was coming around that, and he was coming directly towards me, as though he was coming to the post office, or me and the door, just as though he was coming right over to our store, and as he got up almost opposite the front of the billiard hall I was in the act of call-

ing to him, or saying something to him — I am pretty noisy sometimes to the boys around there and call to them or say something — and just as I was going to speak, Pete Carbo and him got into conversation, and I said nothing. . . . When I first saw him he was right in front of the billiard hall, standing out in front, and Gourko was coming right up this way, and when the conversation occurred Gourko stepped out here at the right-hand corner of the billiard hall and Peter Carbo advanced right up towards him, that way, until they were a few paces apart, and they were saying something I could not understand; I don't think it was in our language; if it was I didn't understand it. Still, I didn't think of any trouble; they were not talking loud at that time, as I understood it. Gourko drew a small bright pistol from his pocket, and he shot at Carbo, and he apparently shot almost in that direction, over his head, and he then almost instantly shot the second time, and Carbo dodged to the right and down'ard, and he shot again, and the third time he shot he dropped his gun further down and fired and Carbo fell." Being asked to describe Carbo's attitude and what was the position of his hands, the witness said: "I can't remember just which hand it was, one hand apparently was thrust in his bosom and the other hand was behind him, but which hand it was I cannot call to mind. It wasn't but just a short time from the time he began to advance until the shooting was done." He further stated, in reply to an inquiry as to when Carbo put his hands behind him: "I think when he started out in front of the billiard hall, about ten or twelve feet from the front of the billiard hall is where I saw him start from, advance out to where Gourko stood. Q. I will ask you to state if you know whether he began to talk to the defendant here when you saw him start out of the billiard hall, when he started towards him? A. Yes, sir; but I could not understand what he said. I think that was in the Slavish language — in some language besides mine. But as he went out there he was talking. I could hear their voices, but I could not understand anything that was said. Q. I believe you say they came around from the front, and Peter came out from the back? A. No, sir; Peter

was standing in front, and Gourko, the first I seen of him, he was opposite the rear of the store, coming up the street or passageway, or whatever you call it, the pass way, and when he got up opposite there, where he could see by the corner of the billiard hall here, like this was the billiard hall, and Gourko was coming up this way, bearing right across, just as though our store was right over here, and he was bearing over from this, as though he was coming over right direct to where I was standing in the door; and Peter Carbo, the first I seen of him, was right in front of that store, and when they began to talk Peter Carbo advanced right out that way, and when he got up in three or four paces of him Gourko stopped. Q. They met right there? A. Yes, sir; when they got together Peter was talking, and I don't know whether this man was saying anything or not. Q. They were saying something in their own language which you did not understand? A. Yes, sir; that boy was standing still when Peter was advancing, and he was standing still when the first shot was fired. Q. The first shot was fired over his head? A. Yes, sir."

There was evidence, on behalf of the government, tending to show that just before the killing Carbo was in the saloon referred to watching a game of billiards; that while he was there Gourko came to the door, and opened a conversation with Carbo which indicated that he was indignant at the language the latter had previously used towards him and did not intend to rest quietly under the insults that had been put upon him; that the parties quickly, and as if by mutual agreement, left the saloon to "settle" the dispute between them; that in a moment or two after they got on the outside the killing occurred; and that Carbo, at the time he was shot, was facing Gourko, with one hand across his bosom, under the lapel of his coat, and the other behind or across his back. There was evidence tending to show that the deceased was often seen, when not quarrelling, with his hands in that position. The third shot fired by defendant took effect, and resulted in the instant death of Carbo. It was clearly proved that he was unarmed at the time he was shot.

The evidence disclosed other circumstances, but those above

stated are the principal facts, and are sufficient for the purpose of presenting the grounds upon which the defendant seeks a reversal of the judgment.

No appearance for plaintiff in error.

*Mr. Assistant Attorney General Conrad* for defendants in error.

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court.

The court below made a long charge in reference to the principles of law which it conceived to be applicable to murder, manslaughter, and self-defence. Among other things, the court said to the jury : " A man has a deliberate intent to kill in the absence of a right to kill under the law of self-defence, and in the absence of that which would mitigate the offence to manslaughter. He cannot have a deliberate intent to kill and then say that his offence was only manslaughter, because the fact that he had an intent to kill implies that he deliberated over that purpose, that he prepared himself for it, and, as you will learn further on, where deliberation, premeditation upon a purpose to slay, where previous preparation to execute that purpose exists, there is banished from the case that condition known as manslaughter, because that grows into existence upon sudden impulse, without previous preparation to take life. Whenever that exists we have malice, and nothing else, unless it is a case where a man prepares himself for self-defence, and then, in order to exonerate himself from that killing, he must execute that preparation where the law gives him a right to do it, and in a defensive way; he may prepare himself for self-defence, but if he kills when there is no case of self-defence, such act of previous preparation becomes criminal in its character because of his subsequent act, and it becomes attached to that act. It does not necessarily import especial malevolence toward the individual slain, but also includes the case of a generally depraved, wicked, and malicious spirit; a heart regardless of social duty, and a mind deliberately bent on mischief. It

imports premeditation." To this part of the charge the defendant duly excepted.

The defendant asked the court to instruct the jury "that preparation in the heat of blood may be followed by manslaughter as well as under a certain state of case it may be followed by murder or self-defence." The court refused to give this instruction, without modification, and to that action of the court the defendant excepted. The court modified the proposition embodied in this instruction by saying to the jury: "If a party prepares to defend himself in a case where he could defend himself, he has a right to do that; but if he prepares himself as I have already told you, and then executes a deadly purpose by killing under circumstances where he would have no right to kill, where there was an absence from the case of the right of self-defence or an absence of the mitigating conduct that I have given to you that would reduce the grade of the crime to manslaughter, then the fact of his previously preparing himself shows deliberation for a deadly criminal purpose, and there could not be manslaughter under such conditions as that. He may prepare himself, as I have already told you, to defend himself in a proper way; but because he has prepared himself to act upon the defensive, if he afterwards abandons that purpose and kills, if he has no right to kill in the absence of facts that would give him the right to defend, then the fact of previous preparation becomes evidence of deliberation, evidence of design. As I have already told you, manslaughter cannot spring out of a state of case where a man prepares himself to kill wrongfully, when he prepares himself to take human life when he has no right to do it. That is evidence of malice aforethought, and it is the distinguishing line between manslaughter and malice aforethought."

We are of opinion that the part of the charge to which the defendant took exception, as well as what the court said in modification of the instruction asked by the defendant, were wanting in the clearness that was requisite in order that the jury might not misapprehend the principles of law by which they were to be controlled.

Assuming, for the purposes of the present inquiry, that the

defendant was not entitled to an acquittal as having acted in self-defence, the vital question was as to the effect to be given to the fact that he armed himself with a deadly weapon after the angry meeting with Carbo in the vicinity of the post office.

If he armed himself for the purpose of pursuing his adversary, or with the intention of putting himself in the way of his adversary, so as to obtain an opportunity to kill him, then he was guilty of murder. But if, in view of what occurred near the post office, the defendant had reasonable grounds to believe, and in fact believed, that the deceased intended to take his life, or to inflict upon him great bodily harm, and, so believing, armed himself solely for necessary self-defence in the event of his being pursued and attacked, and if the circumstances occurring on the occasion of the meeting at or near the saloon were such as, *by themselves*, made a case of manslaughter, then the defendant's arming himself, after the difficulty near the post office, did not have, in itself, the effect to convert his crime into that of murder. Stated in another form: Although the defendant may not have been justified on the occasion and under the particular circumstances of the difficulty at the billiard saloon in believing that the taking of his adversary's life was, then and there, necessary to save his own life or to protect himself from serious bodily harm; nevertheless, the jury were not authorized to find him guilty of murder because of his having deliberately armed himself, provided he rightfully so armed himself for purposes simply of self-defence, and if, independently of the fact of arming himself, the case tested by what occurred on the occasion of the killing was one of manslaughter only.

The court, in effect, said — or the jury may, not unreasonably, have understood the court as declaring — that preparation, by arming, although for self-defence only, could not be followed, in any case, by manslaughter, if the killing, after such arming, was not, in fact, in necessary self-defence. Such we understand to be the meaning of the charge. In our opinion the court erred in so charging the jury. If the accused was justified in the eye of the law in arming himself for self-

defence, and if, without seeking, but on meeting, his adversary, on a subsequent occasion, he killed him, not in necessary self-defence, then his crime was that of manslaughter or murder, as the circumstances, on the occasion of the killing, made it the one or the other. If guilty of manslaughter, looking alone at those circumstances, he could not be found guilty of murder by reason of his having previously armed himself solely for self-defence.

*The judgment is reversed and the cause remanded for a new trial.*