# WILLIAM HENRY MEDLEY *v.* STATE OF MARYLAND

[No. 1696, September Term, 1981.]

*Decided July 14, 1982.*

226

The cause was submitted on the briefs to LISS and WILNER, JJ., and MARTIN A. WOLFF, Associate Judge of the Fifth Judicial Circuit, specially assigned.

Submitted by *David B. Allen* for appellant.

Submitted by *Maureen O'Ferrall Gardner, Assistant Attorney General, Stephen H. Sachs, Attorney General, William A. Swisher, State's Attorney for Baltimore City* and *Sandra Kemick, Assistant State's Attorney for Baltimore City,* for appellee.

WILNER, J., delivered the opinion of the Court.

In an indictment filed in the Criminal Court of Baltimore on November 12, 1980, appellant was charged with the first degree murder of one Paul Watkins, use of a handgun in the commission of a felony or crime of violence, and unlawfully wearing, carrying, and transporting a handgun in violation of Md. Code art. 27, § 36B (b).[1] From his conviction on the last charge, appellant noted this appeal, asking:

---

*Note: *Certiorari* denied, Court of Appeals of Maryland, October 26, 1982.

1. Art. 27, § 36B (b) provides, in relevant part:
    "Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any

1. "Did the trial court violate Maryland Rule 757d by failing to inform counsel of the substance of its instructions and of its action on the requests for instructions before jury arguments?"
2. "Did the trial court err in refusing to instruct the jury that the accused had a right to arm himself in reasonable anticipation of an attack?"
3. "Did the trial court err in instructing the jury that they were bound by its instructions on the law?"

Finding no reversible error, we shall affirm the judgment of the court below.

On August 26, 1980, at approximately 7:00 a.m., appellant appeared at the apartment of his former girlfriend, Charisse Williams, for the purpose of discussing the storage of Williams' furniture while she was on military duty. Upon learning from Ms. Williams that the decedent, Paul Watkins, was in another room, appellant left, going downstairs to the seventh floor apartment of another friend, Betty Mae Floyd. Appellant's departure may have been prompted by the fact that Watkins, who was a heroin user, had earlier told Ms. Williams that he would kill appellant "if he ever saw him in his territory or if he ever said anything wrong to him."

After appellant's departure, Watkins made inquiry of Ms. Williams concerning the knock at the door. When Ms. Williams refused to answer, Watkins began to beat her, only to be interrupted a short time later when Betty Mae Floyd knocked at the door. After a brief conversation, Watkins slammed the door on Ms. Floyd, who then returned to her apartment, while Watkins returned to beating the unfortunate Ms. Williams. At some point, Watkins, apparently surmising that appellant had been at the door earlier, grabbed a kitchen knife and, with Ms. Williams in

person who shall wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads of parking lots generally used by the public in this State shall be guilty of a misdemeanor; . . . ."

tow, proceeded to Ms. Floyd's apartment, whereupon he proceeded to bang on the door and demand, in rather inelegant language, that appellant come out. After a short time, the door opened, and appellant, who was armed, stepped out in the hallway. As he did, Ms. Floyd took hold of Ms. Williams and dragged her into the apartment, in the course of which Ms. Williams saw Watkins go "for the knife," which was tucked into the back of his pants. Appellant then shot Watkins, who fled to a nearby stairwell, where he died.

At trial, after the presentation of evidence had been concluded, the court called for counsel to make closing argument. Without objection from either defense counsel or the State that the court had not yet announced "its proposed action on the request[s] for instructions and the substance of the instructions which it propose[d] to give," as required by Maryland Rule 757d,[2] the Assistant State's Attorney proceeded, submitting that appellant had "made no effort to retreat," and that he could carry a handgun only if he had a valid permit to do so.

After the Assistant State's Attorney had concluded her remarks, and again without bringing to the court's attention its failure to comply with Maryland Rule 757d, defense counsel addressed the jury. Contrary to what the prosecution had just argued, he told the jury that appellant was unable to retreat and that his client was not guilty of wearing, carrying, or transporting a handgun illegally because he had "the right to arm himself in reasonable anticipation of an attack."

The next morning, the court, still unaware of its oversight, proceeded to instruct the jury, telling it, *inter alia,* that "what I tell you about the law is binding on you." No instruction concerning whether appellant had a right to arm himself in reasonable anticipation of attack was given,

---

**2.** Maryland Rule 757d provides:

"The court may give its instructions at any time after the close of the evidence. If, however, the court's charge is not delivered until after the agrument of counsel to the jury, the court shall, in advance of such argument, advise counsel of its proposed action on the request for instructions and the substance of the instructions which it proposes to give."

although such an instruction had been requested by appellant.

At the conclusion of the court's charge, defense counsel complained, among other things, of (1) the court's failure to grant his client's requested instruction "that a person who is not seeking a fight, but is reasonably apprehensive he might be attacked has a right to arm himself in anticipation of such an attack"; and (2) the court's general instruction that its instructions on the law were binding on the jury. Additionally, for the first time, and without seeking any specific relief, counsel objected to the court's failure to comply with Rule 757d. The court made no response other than to submit the case to the jury.

## I.

Appellant's first assignment of error is that the court failed to abide by the provisions of Maryland Rule 757d, thus denying him the "opportunity to reflect on the court's instructions in closing arguments." This omission, he contends, worked to his prejudice in the following ways: (1) "[D]efense counsel's argument that it was the jury's function to interpret the law as to the facts of the case" "clashed" with the court's charge that the jury was bound by its instructions on the law; (2) defense counsel's argument that appellant had a right to arm himself in reasonable anticipation of an attack by Watkins "was not supported by an instruction of the court . . ."; and (3) counsel was unable to ameliorate the conflict by arguing to the jury that "it was their duty to resolve differences between the court and counsel as to the law of the case, and that counsel could argue conflicting interpretations of the law . . . even if the court's instructions were to the contrary."

In response, the State concedes that the trial court failed to comply with Rule 757d, but argues that the issue was not preserved for appellate review because, as we have seen, "[a]ppellant did not bring this omission to the court's attention until after both closing arguments and the court's instructions had been given."

We agree with the State, and conclude that appellant has waived the issue by failing to make a timely objection.

The condition expressed in Rule 757d is a mandatory one. If the trial court opts to reserve its instructions until after closing arguments of counsel, as it has a right to do, it must, *prior* to their closing argument, "advise counsel of its proposed action on the request for instructions and the substance of the instructions which it proposes to give." The obvious purpose of that requirement is to enable counsel to anticipate the court's instructions, and to tailor their arguments accordingly. Given that entirely sensible purpose, it is easy to see how the court's failure to comply with the requirement could be of considerable prejudice to either or both sides in the case; and, if the prejudice went to the accused, the error would ordinarily require a reversal of any adverse judgment entered against him.

There is, however, the equally compelling, and even more pervasive mandate of Maryland Rule 1085 — that "[t]his Court will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court; . . . ."

Maryland Rule 1085 and its counterpart applicable to the Court of Appeals (Maryland Rule 885) express a limitation on appellate review that is of long standing in Maryland. As early as 1826, the General Assembly directed that "the court of appeals shall not reverse or affirm any . . . judgment on any point or question which shall not appear to have been presented to the county court, and upon which that court may have rendered judgment." Acts of 1825, ch. 117. By 1896, it was clear that that limitation was applicable to criminal as well as civil judgments (*see Mitchell v. State,* 82 Md. 527 (1896); *Hamilton v. State,* 127 Md. 312 (1916)). The Court of Appeals gave its own imprimatur to the requirement by including it as part of its original "Rules and Regulations Respecting Appeals" (*see* Rule 9, Md. Code (1951), Appendix B, p. 4823) and by continuing it throughout all the subsequent revisions to the Rules. *See Gordon v. State National Bank,* 249 Md. 378, 383 (1968). As explained in *Basoff v. State,* 208 Md. 643, 650 (1956):

"This rule [then Rule 9] applies to both civil and criminal cases. When a party has the option either to object or not to object, his failure to exercise the option *while it is still within the power of the trial court to correct the error* is regarded as a waiver of it estopping him from obtaining a review of the point or question on appeal. *The Court of Appeals adopted the rule to ensure fairness for all parties to cases and to promote the orderly administration of the law.*" (Emphasis supplied.)

*See also Clayman v. Prince George's County,* 266 Md. 409, 416 (1972), where the Court noted, with respect to Rule 885, that its "principal purposes" were

"(a) to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings, *Lane v. State,* 226 Md. 81, 172 A.2d 400 (1961) and (b) to prevent the trial of cases in a piecemeal fashion, thus accelerating the termination of litigation, . . . ."

It is a matter of basic fairness to the trial court and to opposing counsel, as well as being fundamental to the proper administration of justice; and one need only look at the extensive annotations to Maryland Rules 885 and 1085 to see that it is rigorously enforced. Even errors of Constitutional dimension may be waived by failure to interpose a timely objection at trial (*see, for example, Smith v. State,* 16 Md.App. 317 (1972), *cert. den.* 267 Md. 744 (1973); *Hewitt v. State,* 242 Md. 111 (1966)), and so may alleged violations of sub-constitutional procedural rules. *See Logan v. State,* 289 Md. 460, 487 (1981).

The proper time for objecting to the court's noncompliance with Maryland Rule 757d was when that noncompliance became manifest — prior to the State's initial closing argument or, at the very latest, prior to appellant's closing argument. That is the point at which the omission and any prejudice arising from it became obvious; and that is also the

point at which the court could have easily brought itself into compliance and avoided all possible prejudice to appellant. Waiting until after the instructions had been given to bring the matter to the court's attention runs exactly counter to the expressed purpose of Maryland Rule 1085 and, whether or not intended in this case, smacks of a deliberate entrapment of the trial court.[3] As we said in connection with another section of Maryland Rule 757 (§f), "[i]t is *not* the purpose and design of the rule to provide an avenue for a party to lay away ammunition in the arsenal of appeal," but rather "to correct errors while the opportunity to correct them still exists." *Vernon v. State,* 12 Md.App. 157, 163 (1971).

## II.

Appellant's second contention is that despite the provisions of Md. Code art. 27, § 36B (b), *Gunther v. State,* 228 Md. 404 (1962), recognized a residual common law right "to arm . . . in reasonable anticipation of attack," and that, as such, the court erred in denying his request for an instruction to that effect. In the precise context in which the case reaches us, we disagree, finding *Gunther* to be inapposite.

In *Gunther v. State, supra,* the defendant was charged with the murder of his brother-in-law. In the face of evidence that he had gone to the decedent's home armed with a rifle, the defendant sought to prove that he had acted in self-defense, the decedent having the characteristics of a violent and dangerous person. At the conclusion of the case, and evidently in an effort to minimize the negative inferences that could be drawn from the fact that he had armed himself prior to the confrontation, the defendant requested that the court instruct the jury that he had a right to arm himself in anticipation of an assault. The court refused; and upon appeal from the defendant's subsequent conviction, the Court of Appeals reversed, holding:

---

3. Even at that point, counsel could have asked for an opportunity to supplement his argument to the jury in light of the court's instructions.

"[I]f [the jury] believed that the defendant was not seeking a fight with his brother-in-law, but on the contrary was apprehensive that he might be attacked by him, then the defendant, under such circumstances, would have a right to arm himself in anticipation of the assault. See *Perkins On Criminal Law,* at p. 48, where the author, in citing *State v. Bristol,* 84 P.2d 757 (Wyo. 1938), says that '[o]ne who is not in any sense seeking an encounter, but has reason to fear an unlawful attack upon his life, *does not forfeit his privilege of self-defense merely by arming himself in advance.'* See also *Gourko v. United States,* 153 U.S. 183 (1894); *Thompson v. United States,* 155 U.S. 271 (1894); Hochheimer, *Crimes and Criminal Procedure* (2nd ed.), § 344; Wharton, *The Law of Homicide* (3rd ed.), § 324; 30 Corpus Juris, *Homicide,* §§ 222 and 223; and the cases cited in 40 C.J.S., *Homicide,* § 120, fn. 87." *Id.* at 409 (Emphasis supplied.)

It is important, at the outset, to place the issue presented here in its proper context. At the time the instruction was requested, appellant was charged with a good bit more than illegally carrying a handgun. He was charged also with first degree murder, which he defended on the ground of self-defense. If nothing else, *Gunther* makes clear that, on the issue of self-defense, appellant was entitled to the requested instruction; and, had appellant been convicted of murder, we would have been obliged to reverse.

The fact is, however, that appellant was acquitted of murder (and of using a handgun in the commission of a felony). The issue before us, therefore, is only whether appellant was entitled to the instruction on the "illegal carrying" charge: is a reasonable anticipation of danger a proper defense to a charge of illegally carrying a handgun without a permit? Within that framework, based upon the facts of *Gunther,* the issue actually presented in the case, and a careful reading of the authorities cited by the Court, it is clear that the case does not stand for or even support the proposition advanced by appellant.

In the first place, *Gunther,* and other cases expressing similar holdings (*see, for example, Bennett v. State,* 230 Md. 562 (1963)), have to be viewed in the light of the statutory law then in effect. They were decided before enactment of the 1972 handgun control law under which appellant was convicted. At the time, the relevant prohibition was art. 27, § 36 (a), which prohibited the carrying of *concealed* weapons, including handguns. Section 36 (b), however, expressly exempted from the prohibition of § 36 (a) the carrying and wearing of concealed weapons, including handguns, "as a reasonable precaution against apprehended danger." The carrying of such weapons in that circumstance was not a matter of common law *right;* it simply was not prohibited by statute.

The 1972 Act (Acts of 1972, ch. 13), under which appellant was convicted, removed handguns from the ambit of both § 36 (a) and § 36 (b), and enacted a new and more pervasive set of restrictions with respect to that one type of weapon. In § 36B (b) of art. 27, the Legislature flatly prohibited the wearing, carrying, or transporting of a handgun, whether concealed or open, unless otherwise permitted by § 36B (c). Section 36B (c) does not carry over, however, the exemption formerly contained in § 36 (b); and thus no longer is the law even neutral on the subject. If a person can convince the Superintendent of the Maryland State Police that he needs to carry a handgun as "a reasonable precaution against apprehended danger," he may, if he satisfies the other criteria of § 36E of art. 27, be entitled to a permit to carry such a weapon; but absent such a permit (or the applicability of some other provision of § 36B (c)), he is not entitled to carry the gun.

Given that statutory background, *Gunther* must be read as recognizing no more than the principle expressed in the authorities cited in it — that one does not *necessarily* forfeit his privilege of self-defense because he has previously armed himself in anticipation of an attack. It does not support the existence of any such right to arm, either as a general affirmative right or as a defense to the violation of a statutory prohibition against possessing or carrying weapons in pub-

lic. We are referred to no other authority in support of such a right, and have ourselves uncovered none.

Indeed, what authority there is on the subject seems to establish the contrary principle — that, at common law, it was unlawful for a person to go about armed, even as a protective measure in anticipation of attack. Hawkins (1 Hawkins, *Pleas of the Crown,* 488 (8th Ed., 1824)) notes that it "is said to have been always an offense at common law" for a person to arm himself "with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people. . . ." As early as 1328, Parliament decreed in the Statute of Northhampton (2 Edw. III, c. 3) that no person except the King's servants and ministers would be permitted "to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the king, and their bodies to prison, at the King's pleasure." [4]

In one of the earliest cases arising under that statute, Sir Thomas Figett was arrested because he "went armed under his garments, as well in the palace, as before the justice of the king's bench." 3 Coke, *Institutes* 161. In defense, Sir Thomas pleaded that "there had been debate between him and Sir John Trevet knight . . ., who menaced him, & c. and therefore for doubt of danger, and safeguard of his life, he went so armed." *Id.* at 161-62. Notwithstanding this entreaty, Sir Thomas was ordered to forfeit his arms and suffer imprisonment "during the kings pleasure," the penalties prescribed by the Statute.

Commenting upon this case, a report of which may be found in Norman French at 24 Edw. 3, fo. 33 (Le Second Part De Les Reports Des Cases en Ley, Que furent argues en le temps de le tres Haut & Puissant Prince, Roy Edward le Tierce (1679)), Sir Edward Coke concluded that the Statute of Northhampton did not allow one to "assemble force, though he be extreamely threatened, to goe with him to church, or market, or any other place, . . . ." 3 Coke, *Institutes* 161.

---

4. *See* 10 *Halsbury's Laws of England,* 583 (3d ed. 1955); *Rex v. Sir John Knight,* Comb. 38 (K.B. 1686); 1 Hawkins, *Pleas of the Crown,* 488 (8th ed. 1824); Bishop, *Statutory Crimes,* 531 (3d ed. 1901).

Hawkins agreed, writing "[t]hat a man cannot excuse the wearing such armour in public, by alleging that such a one threatened him, and he wears it for the safety of his person from his assault." 1 Hawkins, *supra,* at 489. That fear of attack did not excuse violation of the common law-based Statute of Northhampton clearly suggests that there is no residual common law right to arm in anticipation of attack sufficient to excuse the violation of art. 27, § 36B, a provision which Chief Judge Gilbert noted, in *Onderdonk v. Handgun Permit Review Board,* 44 Md.App. 132, 135 (1979), "is but a modern improvement on the Statute of Northhampton."

This seems to be the rule generally applied throughout the country. The view has been expressed that, in a sudden emergency, a person may avail himself of a weapon in the immediate vicinity but not otherwise being unlawfully carried, without offending a statutory prohibition against carrying such a weapon (*see, for example, Williams v. State,* 76 S.E. 785 (Ga. App., 1912); *Caldwell v. State,* 198 S.E. 793 (Ga. App., 1938)). However, absent some clear statutory exception such as was formerly embodied in art. 27, § 36 (b), most courts faced with the issue have expressly refused to recognize apprehension of impending danger as a permissible basis for one to carry a weapon in contravention of a general statutory prohibition. *See People v. Townsel,* 164 N.W.2d 776 (Mich. App., 1968); *Lancaster v. State,* 541 P.2d 1343 (Okl., Cr., 1975); *Taylor v. State,* 520 S.W.2d 370 (Tenn. Cr., 1974); *Thompson v. State,* 452 S.W.2d 467 (Tex. Cr., 1970); *State v. Hart,* 157 P.2d 72 (Ida., 1945).

We therefore conclude that the court did not err in declining to give the requested instruction on the issue of whether appellant unlawfully carried a handgun. As to that charge, it was not a correct expression of the law.

III.

Arguing that there was a sound basis for dispute "as to whether or not [his] right to arm himself in reasonable

anticipation of an attack was a defense to the third count [unlawful wearing, carrying, or transporting of a handgun]," appellant's final assignment of error is that the "court erred in instructing the jury that they were bound by his instructions on the law." Again, we must disagree.

Recently, in *Stevenson v. State,* 289 Md. 167 (1980), the Court of Appeals had occasion to review the scope of Article 23 of the Declaration of Rights to the Maryland Constitution, that unique provision declaring that in "the trial of all criminal cases, the jury shall be Judges of law, as well as of fact." Reaffirming (in part) past decisions, the Court stated:

> "[I]t is incumbent upon a trial judge to carefully delineate for the jury the following dichotomy: (i) that the jury, under Article 23, is the final arbiter of disputes as to the substantive 'law of the crime,' as well as the 'legal effect of the evidence,' and that any comments by the judge concerning these matters are advisory only; and (ii) that, by virtue of this same constitutional provision, all other aspects of law (e.g., the burden of proof, the requirement of unanimity, the validity of a statute) are beyond the jury's pale, and that the judge's comments on these matters are binding upon that body." *Id.* at 180.

As later explained in *Montgomery v. State,* 292 Md. 84, 89 (1981), Article 23 thus requires the court to instruct the jury that its (the court's) instructions are advisory *only* in circumstances where there is a "dispute as to the proper interpretation of the law of the crime for which there is a *sound basis.*" (Emphasis in the original.)

For the reasons cited above, we believe that there was no sound basis for dispute as to the law of the crime in this instance; and, as a result, we believe that the court properly instructed the jury that they were bound by his legal instructions.

> *Judgment affirmed; appellant to pay the costs.*