487 A.2d 1214

**Leonard Rollon CRAWFORD**

v.

**STATE of Maryland.**

**No. 644, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Feb. 13, 1985.

Edward N. Everett, Landover (Roane & Everett, P.C., Washington, D.C., on the brief), for appellant.

Deborah K. Chasanow, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Arthur A. Marshall, Jr., State's Atty. for Prince George's County and Constance Junghans, Asst. State's Atty., Upper Marlboro, for Prince George's County, on the brief), for appellee.

Submitted before GILBERT, C.J., and WEANT and ALPERT, JJ.

GILBERT, Chief Judge.

"Self-defense," according to Sir William Blackstone in 3 Commentaries on the Laws of England *4, "is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society." Indeed, self-defense both in England and in Maryland has been held to be an excuse for breaches of the peace and even homicide.

■■■ Included within the broader concept of self-defense is the narrower defense of necessity, *i.e.*, that the duress of the circumstances compelled the commission of the crime, thus making the offense excusable. R.M. Perkins and R.N. Boyce, *Criminal Law*, ch. 9, § 2H (3rd Ed.1982). Necessity does not justify killing "an innocent and unoffending neighbour" in order to save oneself, *id*, but does it permit violation of a statute? More specifically, does it allow a person openly to carry a handgun in direct violation of Md.Ann.Code art. 27, § 36B? Phrased differently, has § 36B abolished the defense of necessity as to carrying, wearing or transporting handguns?

Before discussing the applicable law, we shall set the scene as it was presented to a jury in the Circuit Court for Prince George's County. The police narration was unremarkable, but as told by the appellant, Leonard Rollon Crawford, the tale has all the aspects of a grade B 1940's movie, with a little of Dashiell Hammett and Raymond

Chandler added for zest and a dash of Mickey Spillane for violence.

The officers' version of events was that they responded to a telephone call about "shots being fired" in the 5200 block of Marlboro Pike in Prince George's County. One officer, Joseph A. Wiggs, saw Crawford, armed, beside a halted vehicle. Officer Wiggs testified that he identified himself as a police officer and "requested that ... [Crawford] drop the weapon." He said, "Crawford spun around ... took several steps toward me ... [and] then crouched into a combat position using both hands with the weapon and pointed them at me." Wiggs, expressing his initial disbelief at what was occurring at that time, "saw what ... [he] construed to be hate [on Crawford's face]," and Wiggs fired at Crawford but he was not sure "how many rounds ... [he] fired." Crawford "seemed to disappear." Wiggs next observed that Crawford was on the ground still grasping the gun in both hands. According to Wiggs, Crawford "attempted to fire again," at which time "[Wiggs] fired ... [his] revolver." Another officer, Jimmie Staten, who was carrying a shotgun, fired simultaneously at Crawford. Finally, Crawford threw the weapon away. It was later discovered that the trigger was missing. Officer Wiggs' version of events was verified through the testimony of other State witnesses.

We have indicated that according to Officer Wiggs the trigger to the firearm was "missing." Subsequent testimony by a firearm's expert was that the hammer was broken, the trigger was intact. Because of the broken hammer, the weapon was inoperable in that it would not fire. There were three expended casings in the revolver; the cylinder was still trochoid. The expert opined that a fall or jump from a second floor window by someone holding the gun could have resulted in the broken hammer.

Crawford, who sustained a number of gunshot wounds, told the jury of a different sequence of events. He said that he had some friends in his apartment, and they planned to go nightclubbing. Crawford decided when they all left

the apartment and went to the parking lot not to go nightclubbing, but he loaned his vehicle to his friends. He returned to his apartment, undressed, and reclined on the bed. Crawford heard a knock at the door, arose, pulled on "a pair of jeans," and went to the front door. There he identified the friends to whom he had loaned his car. They, through the closed door, told him that they had a flat tire. Crawford then related to the jury what might be termed a virtual incubus. He said:

"As I got ready to open the door, I heard movement behind me in my apartment. I turned around in time to see in the back of the apartment about between the bathroom and the bedroom something moving. At that point a gun was fired at me several times.... I moved away from my door and said ... '[g]et away from here. Get some help. Somebody's in my apartment.'

I heard the bathroom door close. I assume the person or persons moved ... into the bathroom. I cross the living room to the bar and picked up the phone to call the police.... when I picked the phone up, I realized I hadn't paid the bill. It had been cut off. I reached behind the bar where I had a short piece of wood, about, maybe, 16 inches long, crossed ... [toward] my stereo, began to beat on the floor and turn the volume up on my stereo to attract attention of the neighbors.

"I sat there approximately, maybe it seemed like an eternity, but I was so scared it probably could have been one or two minutes. At that point I heard movement again. I looked toward the door and decided, well, if the person is going to keep coming out the bathroom—if I run out the front door, maybe this person will shoot me and hit me in the back so I better not do that.

"Hearing a door shut, I wasn't sure then what door it was. I decided the best thing to do would be to crawl into the bedroom, shut the door, and then decide what to do because it had a lock on it.

"As I got on my knee—and what I did, I pushed the door to the bedroom open, began to stand up. There

were several flashes—I don't recall if I heard shots; I just know there was several more flashes there. There weren't any lighting going on or anything. Someone to my left moved from behind the door. At that point, another individual standing in front of me raised a handgun in my direction. I hit him as hard as I could with that stick, closed the hand he was holding the gun in. At that point the other person tried to grab me. The person that I hit with the stick at first attempted to fire the gun at me several times.

"I reached out to grab the gun. I think I gripped it by the barrel. In the process, I fell out through the glass and out of the window down to the front below and landed in the dirt. It was very wet and rainy outside that night. I was very disoriented. I didn't know how long I had been there. I knew that my head was hurting. I had trouble seeing because there was blood running out my eyes, and my shoulder was hurting terribly. There was blood coming from my shoulder. I believed myself to have been shot. I tried to get up, but I kept staggering and falling back down. There were footsteps coming in my direction.

"I realized the gun was there, and I picked the gun up to defend myself if the person or persons who had assaulted me in my apartment were coming back out the apartment after me. I couldn't get up. Then I began to crawl inside. It's like a little gully way. I had to slide or scoot, rather down to the next building where there was a little brick wall and grab hold of that in order to start—to ascend the incline that I fell down off of.

"When I got up to the sidewalk, I began to walk looking around me in all directions because I was scared. I saw a light coming from the parking lot. I went towards that light. I saw a car door open. I went toward those people asking for help. . . . [T]he individual in the car turned around, and I realized it was the same person that had been in my apartment and had shot at me.

"He said to the other person, 'Hand me the other gun.' I think he seen my face. I turned at that point to run. I ran across the parking lot, but I slipped and I fell. He came around me from in front of two or three more cars and shot me in the right leg. My leg, it felt like somebody hit me with a pipe or something. I fell again on my face. I got up. I fell. I laid there. I heard the engine of a car start. I heard more footprints—footsteps. I got up and proceed to run. Again, the car went on ahead in front of me. I was holding onto the various cars trying to walk it hurt so bad.

"At this point, as soon as I stepped out in front of another car, I was shot two more times in my left leg. I fell. I couldn't get up. At that point, I had to try and get myself together. I couldn't see. Everything was going on around me, and there was this blood just kept on running out my face and my legs were hurting real bad. I didn't think I could get up.

"When I did manage to pull myself up out the bumper of a car, I decided to cross over. Again, I assume, well, they are on this side of the parking lot. Before I could cross over, the car pulled back down the parking lot, slammed on brakes. I tried to run. I dropped the gun, and then I fell myself. I heard the footprints. I looked and I saw the same man coming at me with the gun. I reached out to pick out the gun. He turned around, went back to the car. He got in the car. The driver of the car, I imagine, put it in reverse because the wheels began to spin, and they took off backwards out the parking lot.

"I proceeded up the parking lot in the direction of the 7-Eleven where I believe the people would be. My path was totally disoriented. I bumped in to the car to tree to building. I fell in the gutter. I don't know. At some point I laid there for several minutes before I could regain my strength to get up again.

"As I neared the entryway to the apartment complex in the driveway where this occurred, the same car, the same

individuals, tried to hit me. And trying to avoid it, I ran toward the right which carried me out into the roadway of Marlboro Pike. This car almost hit me, but it missed me, and it went past me. I tried then to cross from that lane over to the next lane. I was going to run across the street. At this point that car came directly toward me. I put my hands forward in a futile attempt. I guess I must have thought I could stop the car or something. I couldn't.

"We were there for, say, it seemed like almost about 30 seconds. I was just looking at the driver in a gesture as to why because I knew I knew one of the guys. I just wanted to know why, why my house, why me? And I heard the engine of the car and off in the distance behind me I heard another gunshot. The bullet struck me in my leg. It hurt so bad that my right leg almost gave. I took my right hand and reached behind my leg. I began to fall. Another bullet struck me on the inside of my left knee. I grabbed my left knee. As I turned, I was shot. Again, this time it hit me in the stomach. Several times I fell to the ground. I laid there. I put my hand in front of me. I was semiconscious, off and on. I tried to lift myself up off the ground.

"I looked. I tried to look up, and I was struck again. This time I turned. It caused me to turn over on my back, my feet. I was spread eagle. I felt a pain in my foot that nearly lifted me off the ground. I wasn't aware of any gunshots. I was just feeling pain at this time.

"I tried to turn off, and I tried to crawl. I tried to get away. I was laying there in the street. I couldn't see maybe as far as from here to that black notebook, which, I say, maybe is eight feet. I heard a loud engine off in the distance. I couldn't see the car, but I heard an engine.

"The engine came. It was getting closer and closer. I thought I was going to get run over. I tried to get up again. I couldn't. When the car stopped, someone behind me said that he was the police. I said, 'I can't see

you. Come in front of me or besides me so I can see the leg of your uniform. I can't see. Someone has shot me. I don't know who it was.'

"And the officer came around to my left, someone to the left, but was a female, said, 'You shot the wrong man.' I was laying in the street.... That officer came to within six feet to the left of me....

....

"The other officer said, 'Shoot him.' The gun was aimed at my head. I looked up, and I saw the gun being aimed at my head. I threw my arms over my head like this (indicating), and the bullet struck me in my arm. The entire hand began to shake. I trembled all over because it hit the bone. It came out here (indicating), and it hit me again in the chest tearing a hole in the side of my chest.

"At this point, the gun had been out of my hand. An officer came around to my right. I don't know who went to get that weapon. He turned me over with his foot. They went through my pocket. My clothing was cut off there at the scene. Someone said something to me, and I said a prayer because I knew I was going. Then I said, 'God of Mercy, forgive me for my sins and accept me in my salvation into Heaven.' At that point I was unconscious."

There was additional evidence that tended to support Crawford's narrative as to the shooting in the apartment and as to his exiting therefrom via defenestration.[1] Furthermore, the State elicited the response from Crawford that he may have ingested phencyclidine (PCP) at some point during the evening.

---

1. The record reveals that two witnesses testified that at least one shot was fired, which sounded to them as if it had been fired from inside Crawford's apartment. They testified that after the shot or shots were fired inside the building, they then heard the sound of breaking glass and saw Crawford on the ground below his window. One of the witnesses also stated that two unidentified males were seen running from Crawford's apartment building at approximately the time of Crawford's unorthodox egress.

At the close of Crawford's trial for carrying a handgun in violation of Md.Ann.Code art. 27, § 36B, defense counsel sought a jury instruction that the appellant's action, with respect to the possession of the handgun, was one of necessity. The trial judge refused, stating:

"It is the opinion of this court that a necessity instruction would come under the common law. That under the common law there was no prohibition for arming yourself in any way, but that the purpose of the statute, Article 36B, was to preempt the common law and to bring everything under statute with respect to a handgun. That is what we are talking about, a handgun, and that the statute outlines in minute detail, those permissible exceptions...."

We think the trial court erred in not granting an instruction dealing with the right of the defendant, under the circumstances, to possess a handgun, Md.Ann.Code art. 27, § 36B notwithstanding.

Md.Ann.Code art. 27, § 36B(b) provides, in pertinent part:

"Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads or parking lots generally used by the public in this State shall be guilty of a misdemeanor; and it shall be a rebuttable presumption that the person is knowingly transporting the handgun; ...."

In *Medley v. State*, 52 Md.App. 225, 448 A.2d 363, *cert. denied*, 294 Md. 544 (1982), this Court made clear that carrying a handgun as "a reasonable precaution against apprehended dangers" is lawful only if the carrier has satisfied the Maryland State Police of the necessity, and a permit has been issued to carry the weapon. Absent such a permit, no one is permitted to carry a gun. *Id.* at 234, 448 A.2d at 367–68.

Judge Wilner, writing for the Court in *Medley,* traced the history of § 36B commencing with the Statute of Northhampton, 2 Edw. III, ch. 3 (1328) through a 1679 Comment in Norman French at 24 Edward 3, fo. 33, to 3 Coke *Institutes* 161, thence to 1 Hawkins, *Pleas of the Crown,* 488 (8th Ed.1824). Throughout that period of legal history, it was, contrary to popular belief, "unlawful for a person to go about armed, even as a protective measure in anticipation of attack." *Medley* at 235, 448 A.2d at 368.

Going about armed in anticipation of an attack is one thing; to be armed defending oneself from an actual ongoing attack is another. Nothing in *Medley* proscribes defense of oneself; nothing in *Medley* runs contrary to human nature and dictates that one who is or believes he or she is under attack must stand unarmed because he or she does not have a permit to carry a handgun. No decision of the Court of Appeals or of this Court ever contemplated such a happening.

■ The general rule, as stated in *Medley,* is that in a "sudden emergency, a person may avail himself of a weapon in the immediate vicinity but not otherwise being unlawfully carried...." *Id.* at 236, 448 A.2d at 368–69.

We cannot perceive of a more dire emergency than arming oneself when he or she is by force of arms placed in a position of grave peril. Patently, when one is besieged by predators, he or she does not pause to consider whether a statute, such as Md.Ann.Code art. 27, § 36B, ostensibly prohibits certain forms of self-defense. On the contrary, the victim reaches out for help, any help, in whatever form it may take. To hold that the statute, § 36B, forbids the use of a handgun, under the peculiar circumstances attendant in the instant case, would defy not only a primary law of nature but also common sense.

■ It was for the jury—not the trial judge or us—to believe or disbelieve Crawford's narrative of the events occurring on the fateful night of his arrest. What we do believe, however, is that Crawford's version of the events

generated a jury issue as to whether he armed himself in actual self-defense. We think the evidence offered by Crawford, if believed, establishes that he was in peril, that he was under attack by assailants bent on his destruction, and that his carrying of the handgun was excusable. Consequently, we conclude the jury should have been instructed on the question of necessity, *i.e.*, duress of the circumstances.

We expressly limit our holding to the facts of this case, and we are not to be understood as placing a judicial imprimatur upon the carrying of a handgun because of a belief that attack upon the person is a strong possibility, or is otherwise apprehended. The question of carrying a handgun under the latter circumstances has previously been answered in *Snowden v. Handgun Permit Rev. Bd.*, 45 Md.App. 464, 413 A.2d 295, *cert. denied*, 288 Md. 742 (1980), where we made clear that it is the Handgun Permit Review Board, and not the individual concerned, that determines whether given facts constitute "apprehended danger" sufficient to warrant issuance of a permit to carry a handgun.

JUDGMENT REVERSED. CASE REMANDED FOR A NEW TRIAL. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.