521 A.2d 1193

**STATE of Maryland**

v.

**Leonard Rollon CRAWFORD.**

**No. 61, Sept. Term, 1985.**

Court of Appeals of Maryland.

March 6, 1987.

684

Deborah K. Chasanow, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on the brief), Baltimore, for appellant.

George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH *, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

COLE, Judge.

We granted certiorari in this case to determine whether the defense of necessity is available to a charge of illegal possession of a handgun under Maryland Code (1957, 1982 Repl.Vol., 1986 Cum.Supp.), Art. 27, § 36B(b).

---

* Smith, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

The facts in this case are peculiar and must be recounted in detail to retain their full effect. The defendant, Leonard Crawford, was charged in the Circuit Court for Prince George's County with two counts of assault on a police officer and one count of carrying a handgun in violation of Art. 27, § 36B(b). At trial, police officer Joseph Wiggs testified that in the early morning hours of April 3, 1983, he saw Crawford standing beside a halted automobile and pointing a handgun into the driver's side of the vehicle. Wiggs testified that he turned on the emergency equipment in his patrol car, parked it near Crawford, and alighted from his car. He then identified himself as a police officer and asked Crawford to drop his weapon. Wiggs testified that he was surprised by Crawford's response: "[Crawford] spun around [and] took several steps toward me. He then crouched into a combat position using both hands with the weapon and pointed [it] at me." Wiggs further testified that he fired at Crawford and then lost sight of him. When Wiggs saw Crawford again moments later, Crawford was lying on the ground still grasping the gun. According to Wiggs, Crawford "attempted to fire again," at which time Wiggs and another uniformed police officer shot at Crawford. Wiggs stated that he implored Crawford to discard his weapon and Crawford finally threw it away. When the police later recovered Crawford's gun, they discovered that its trigger was missing. Various state witnesses verified Wiggs's rendition of the facts.

Crawford also testified at trial, but he offered a somewhat different story to the jury. According to Crawford, he and some friends were in his apartment and planned to go to a nightclub that evening. After walking out to the parking lot, however, Crawford reconsidered and informed his friends that he was going to stay home instead. Nevertheless, he allowed his friends to use his car to go to the nightclub. Crawford then returned to his apartment and relaxed on his bed. A few minutes later, he heard a knock on his door, and he went to answer it. Through the closed door, his friends informed him that his car had a flat tire.

Up until this point, Crawford's night was not particularly unusual. After this point, however, his night can be described as nothing less than bizarre. Crawford testified as follows:

As I got ready to open the door, I heard movement behind me in my apartment. I turned around in time to see in the back of the apartment about between the bathroom and the bedroom something moving. At that point a gun was fired at me several times in my direction. I moved away from my door and said, "Stand there. Get away from here. Get some help. Somebody's in my apartment."

I moved into the shower. I heard the bathroom door close. I assume the person or persons moved back into the bathroom. I cross[ed] the living room to the bar and picked up the phone to call the police. At that point, when I picked the phone up, I realized I hadn't paid the bill. It had been cut off. I reached behind the bar where I had a short piece of wood, about, maybe, 16 inches long, crossed over [to] my stereo, began to beat on the floor and turn the volume up on my stereo to attract attention on the neighbors.

I sat there approximately, maybe it seemed like an eternity, but I was so scared it probably could have been one or two minutes. At that point I heard movement again. I looked toward the door and decided, well, if the person is going to keep coming out [of] the bathroom—if I run out the front door, maybe this person will shoot me and hit me in the back so I better not do that.

Hearing a door shut, I wasn't sure then what door it was. I decided the best thing to do would be to crawl into the bedroom, shut the door, and then decide what to do because it had a lock on it.

As I got on my knee—and what I did, I pushed the door to the bedroom open, began to stand up. There were several flashes—I don't recall if I heard shots; I just know there [were] several more flashes there. There [wasn't] any light[n]ing going on or anything. Someone

to my left moved from behind the door. At that point, another individual standing in front of me raised a handgun in my direction. I hit him as hard as I could with that stick, closed the hand he was holding the gun in. At that point the other person tried to grab me. The person that I hit with the stick at first attempted to fire the gun at me several times.

I reached out to grab the gun. I think I gripped it by the barrel. In the process, I fell out through the glass and out of the window down to the front below and landed in the dirt. It was very wet and rainy outside that night. I was very disoriented. I didn't know how long I had been there. I knew that my head was hurting. I had trouble seeing because there was blood running out [of] my eyes, and my shoulder was hurting terribly. There was blood coming from my shoulder. I believed myself to have been shot. I tried to get up, but I kept staggering and falling back down. There were footsteps coming in my direction.

I realized the gun was there, and I picked the gun up to defend myself if the person or persons who had assaulted me in my apartment were coming back out [of] the apartment after me. I couldn't get up. Then I began to crawl inside. It's like a little gully way. I had to slide or scoot, rather down to the next building where there was a little brick wall and grab hold of that in order to start—to ascend the incline that I fell down off of.

When I got up to the sidewalk, I began to walk looking around me in all directions because I was scared. I saw a light coming from the parking lot. I went towards that light. I saw a car door open. I went toward those people asking for help. As I got as far as from here to where this lady is in the white jacket [indicating], the individual in the car turned around, and I realized it was the same person that had been in my apartment and had shot at me.

He said to the other person, "Hand me the other gun." I think he seen my face. I turned at that point to run. I

ran across the parking lot, but I slipped and I fell. He came around me from in front of two or three more cars and shot me in the right leg. My leg, it felt like somebody hit me with a pipe or something. I fell again on my face. I got up. I fell. I laid there. I heard the engine of a car start. I heard more footprints—footsteps. I got up and proceed[ed] to run. Again, the car went on ahead in front of me. I was holding onto the various cars trying to walk because it hurt so bad.

At this point, as soon as I stepped out in front of another car, I was shot two more times in the left leg. I fell. I couldn't get up. At that point, I had to try and get myself together. I couldn't see. Everything was going on around me, and there was this blood just kept on running out [of] my face and my legs were hurting real bad. I didn't think I could get up.

When I did manage to pull myself up [from under] the bumper of a car, I decided to cross over. Again, I assume, well, they are on this side of the parking lot. Before I could cross over, the car pulled back down the parking lot, [and] slammed on [its] brakes. I tried to turn. I dropped the gun, and then I fell myself. I heard the foot[steps]. I looked and I saw the same man coming at me with the gun. I reached out to pick out the gun. He turned around, went back to the car. He got in the car. The driver of the car, I imagine, put it in reverse because the wheels began to spin, and they took off backwards out [of] the parking lot.

I proceeded up the parking lot in the direction of the 7–Eleven where I believe the people would be. My path was totally disoriented. I bumped into the car, [in]to [a] tree, [in]to [a] building. I fell in the gutter. I don't know. At some point I laid there for several minutes before I could regain my strength to get up again.

As I neared the entryway to the apartment complex in the driveway where this occurred, the same car, and the same individuals, tried to hit me. And trying to avoid it, I ran toward the right which carried me out into the

roadway of Marlboro Pike. This car almost hit me, but it missed me, and it went past me. I tried then to cross from that lane over to the next lan[e]. I was going to run across the street. At this point that car came directly toward me. I put my hands forward in a futile attempt. I guess I must have thought I could stop the car or something. I couldn't.

We were there for, say, it seemed like almost about 30 seconds. I was just looking at the driver in a gesture as to why because I knew I knew one of the guys. I just wanted to know why, why my house, why me? And I heard the engine of the car and off in the distance behind me I heard another gunshot. The bullet struck me in my leg. It hurt so bad that my right leg almost gave. I took my right hand and reached behind my leg. I began to fall. Another bullet struck me on the inside of my left knee. I grabbed my left knee. As I turned, I was shot. Again, this time it hit me in the stomach. Several times I fell to the ground. I laid there. I put my hand in front of me. I was semi-conscious, off and on. I tried to lift myself up off the ground.

I looked. I tried to look up, and I was struck again. This time I turned. It caused me to turn over on my back, my feet. I was spread eagle. I felt a pain in my foot that nearly lifted me off the ground. I wasn't aware of any gunshots. I was just feeling pain at this time .

I tried to turn off, and I tried to crawl, I tried to get away. I was laying there in the street. I couldn't see maybe as far as from here to that black notebook, which, I say, maybe is eight feet. I heard a loud engine off in the distance. I couldn't see the car, but I heard an engine.

The engine came. It was getting closer and closer. I thought I was going to get run over. I tried to get up again. I couldn't. When the car stopped, someone behind me said that he was the police. I said, "I can't see you. Come in front of me or besides me so I can see the

leg of your uniform. I can't see. Someone has shot me. I don't know who it was."

And the officer came around to my left, someone to the left, but it was a female, said, "You shot the wrong man." I was laying in the street, like this [indicating]. That officer came to within six feet to the left and the other officer said—

MS. JUNGHANS: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: The other officer said "Shoot him." The gun was aimed at my head. I looked up, and I saw the gun being aimed at my head. I threw my arms over my head like this [indicating], and the bullet struck me in my arm. The entire hand began to shake. I trembled all over because it hit the bone. It came out here [indicating], and it hit me again in the chest tearing a hole in the side of my chest.

At this point, the gun had been out of my hand. An officer came around to my right. I don't know who went to get that weapon. He turned me over with his foot. They went through my pocket. My clothing was cut off there at the scene. Someone said something to me, and I said a prayer because I knew I was going. Then I said, "God of Mercy, forgive me for my sins and accept me in my salvation into Heaven." At that point I was unconscious.

Crawford's account was supported by other witnesses who testified that shots were fired inside Crawford's apartment, that Crawford was lying on the ground below his broken glass window, and that two unidentified males fled Crawford's apartment at approximately the same time that he fell out of his window. Moreover, the doctor who treated Crawford after the incident testified that Crawford had received numerous gunshot wounds.

At the close of the evidence, defense counsel requested that the trial judge instruct the jury as to the availability of the defense of necessity to the charge of unlawful posses-

sion of a handgun. The trial judge refused to give the instruction, finding that there was no exception for necessity provided in Art. 27, § 36B. The jury found Crawford not guilty of assault, but guilty of unlawful possession of a handgun. The Court of Special Appeals reversed, finding that the trial court erred in not giving a necessity instruction. The intermediate appellate court held that the defendant had a right, under the circumstances, to possess the gun. *Crawford v. State,* 61 Md.App. 620, 487 A.2d 1214 (1985). We granted certiorari to consider the important question presented.

We begin our analysis by reviewing the defense of necessity.[1] In *Sigma Reproductive Health Center v. State,* 297 Md. 660, 467 A.2d 483 (1983), we thoroughly examined the necessity defense and found that it arises when an individual is faced with a choice of two evils, and one is the commission of an illegal act. *Id.* at 677, 467 A.2d at 491. We also recognized that the justification for the necessity defense is not that a person faced with a choice of two evils lacks the *mens rea* for the crime in question, but that the law promotes the achievement of higher values at the expense of lower ones and that " 'sometimes the greater good for society will be accomplished by violating the literal language of the criminal law.' " *Id.* at 676, 467 A.2d at 491 (quoting W. LaFave & A. Scott, Jr., *Criminal Law* § 50 (1972)).

---

1. When the pressure causing a defendant to commit a criminal act is caused by human beings, his defense will usually be "duress" rather than "necessity." *See Sigma Reproductive Health Center v. State,* 297 Md. 660, 675, 467 A.2d 483, 490 (1983) (quoting W. LaFave & A. Scott, Jr., *Criminal Law* § 50 (1972)). But, as LaFave and Scott point out:
    The typical duress case, however, has involved a situation in which *A* has ordered *B* to engage in certain conduct prohibited by the criminal law or else suffer certain consequences. It might well be argued that when an individual acts to avoid a greater harm from a person who has not given such an order ... the situation ought to be dealt with as a form of necessity rather than duress.
    W. LaFave & A. Scott, Jr., *supra,* at 381–82 n. 2. We will refer to the defense in this case as "necessity."

With this rationale in mind, we must examine the class of crimes for which the defense of necessity is available. The Court of Special Appeals has previously stated that the defense of necessity is available to all crimes except the killing of an innocent person. *Frasher v. State,* 8 Md.App. 439, 447–48, 260 A.2d 656, 661, *cert. denied,* 400 U.S. 959, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970) (cited without comment in *Sigma Reproductive Health Center v. State, supra,* 297 Md. at 679–80, 467 A.2d at 492–93). While we agree with the *Frasher* court's conclusion that the defense has a broad application, we also recognize that the legislature is empowered to eliminate the necessity defense for any crime. Accordingly, we must determine whether the General Assembly, by enacting § 36B, intended to eliminate the defense of necessity to a charge of unlawful possession of a handgun.

A review of § 36B's history is essential. Prior to the section's enactment, prohibitions on the possession of a handgun were controlled by Maryland Code (1957, 1971 Repl.Vol.), Art. 27, § 36.[2] Section 36(a) prohibited any

---

2. Maryland Code (1957, 1971 Repl.Vol.), Art. 27, § 36 provided in pertinent part:

(a) *Carrying concealed or openly with intent to injure; carrying by minors at night in certain counties.*—Every person who shall wear or carry any pistol, dark knife, bowie knife, switchblade knife, sandclub, metal knuckles, razor, or any other dangerous or deadly weapon of any kind, whatsoever (penknives without switchblades excepted) concealed upon or about his person, and every person who shall wear or carry any such weapon openly with the intent or purpose of injuring any person in any unlawful manner, shall be guilty of a misdemeanor. . . .

(b) *Exceptions.*—Nothing in this section shall be construed to prevent the carrying of any of the weapons mentioned in the preceding paragraph of this section by an officer of this State, or of any county or city therein, who is entitled or required to carry such weapon as part of his official equipment, or by any conservator of the peace, who is entitled or required to carry such weapon as part of his official equipment, or by any officer or conservator of the peace of some other state temporarily sojourning in this State, or by any special agent of a railway or by any person to whom a permit to carry a concealed weapon has been issued under § 90A of Article 56 of the Code, or by any person who shall carry such weapon as a

person from carrying a weapon, including a pistol, concealed on his person or openly with the intent to injure. Subsection (b) created an exception from the prohibition for officers of the government and persons carrying weapons "as a reasonable precaution against apprehended danger."

In 1972, the General Assembly enacted strong handgun control legislation. 1972 Md.Laws, ch. 13. The impetus for the reform was the legislature's recognition that there had been a dramatic increase in the number of crimes perpetrated with handguns and a concommitant increase in the number of deaths and injuries caused by persons carrying handguns on the streets who were "inclined to use them in criminal activity." Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 36B(a)(i)–(ii). As part of the more stringent regulation, the legislature removed the prohibition on carrying handguns from § 36(a) and placed it in the newly created § 36B(b)[3]. Section 36B(b) sets forth a blanket rule that prohibits any person from carrying, whether open or concealed, any handgun. Subsection (c) of § 36B specifically sets forth the exceptions to subsection (b).[4] Individuals

---

reasonable precaution against apprehended danger, but the tribunal before which any case arising under the provisions of this section may be tried, shall have the right to judge of the reasonableness of the carrying of any such weapon, and the proper occasion therefor, under the evidence in the case.

3. Maryland Code (1957, 1982 Repl.Vol., 1986 Cum.Supp.), Art. 27, § 36B(b) states in pertinent part:

(b) *Unlawful wearing, carrying, or transporting of handguns; penalties.*—Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads or parking lots generally used by the public in this State shall be guilty of a misdemeanor; and it shall be a rebuttable presumption that the person is knowingly transporting the handgun....

4. Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 36B(c) states:

(c) *Exceptions.*—(1) Nothing in this section shall prevent the wearing, carrying, or transporting of a handgun by (i) law-enforcement personnel of the United States, or of this State, or of any county or city of this State, (ii) members of the armed forces of the

who may lawfully carry handguns include law enforcement personnel, persons with permits, persons transporting hand-

United States or of the National Guard while on duty or traveling to or from duty; or (iii) law-enforcement personnel of some other state or subdivision thereof temporarily in this State on official business; (iv) any jailer, prison guard, warden, or guard or keeper at any penal, correctional or detention institution in this State; or (v) sheriffs and temporary or fulltime sheriffs' deputies, as to all of whom this exception shall apply only when they are on active assignment engaged in law enforcement; provided, that any such person mentioned in this paragraph is duly authorized at the time and under the circumstances he is wearing, carrying, or transporting the weapon to wear, carry, or transport such weapon as part of his official equipment.

(2) Nothing in this section shall prevent the wearing, carrying, or transporting of a handgun by any person to whom a permit to wear, carry or transport any such weapon has been issued under § 36E of this article.

(3) Nothing in this section shall prevent any person from carrying a handgun on his person or in any vehicle while transporting the same to or from the place of legal purchase or sale, or between bona fide residences of the individual, or between his bona fide residence and his place of business, if the business is operated and substantially owned by the individual, or to or from any bona fide repair shop. Nothing in this section shall prevent any person from wearing, carrying, or transporting a handgun used in connection with a target shoot, formal or informal target practice, sport shooting event, hunting, trapping, dog obedience training class or show or any organized military activity while engaged in, on the way to, or returning from any such activity. Nothing in this section shall prevent any bona fide gun collector from moving any part or all of his gun collection from place to place for public or private exhibition. However, while traveling to or from any such place or event referred to in this paragraph, a handgun shall be unloaded and carried in an enclosed case or enclosed holster.

(4) Nothing in this section shall prevent a person from wearing, carrying, or transporting a handgun within the confines of real estate owned or leased by him or upon which he resides or within the confines of a business establishment owned or leased by him. Nothing in this section shall prevent a supervisory employee from wearing, carrying, or transporting a handgun within the confines of a business establishment in which he is employed during such time as he is acting in the course of his employment and has been authorized to wear, carry, or transport the handgun by the owner or manager of the business establishment.

(5) Nothing in this section shall prevent a person from carrying or transporting any signal pistol or other visual distress signal approved by the United States Coast Guard, in any vessel used upon

guns for legitimate purposes, and persons on their own property. Conspicuously absent from subsection (c) is an exception for carrying a handgun "as a reasonable precaution against apprehended danger." The legislature did not carry over this exception from § 36(c) and instead created § 36E,[5] which requires any person wishing to carry a handgun to apply for a permit from the Superintendent of the Maryland State Police. A permit will be issued when there is a "good and substantial reason," including when it "is necessary as a reasonable precaution against apprehended danger." Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 36E(a)(6).

It is clear that the 1972 handgun control legislation is designed to discourage and punish the possession of handguns on the streets and public ways. The legislature determined that if a citizen is apprehensive of impending danger, his recourse is not to immediately arm himself, but instead to seek help from the State—by applying for a permit to carry a gun or, of course, by contacting the police for protection. Thus, by controlling the number of handguns in the public, and not permitting citizens to carry guns when there is time for alternative, safe action, the legislature sought to "preserve the peace and tranquility of the State and to protect the rights and liberties of its citizens." *Id.* § 36B(a)(iv).

---

the waterways of this State, or if unloaded and carried in an enclosed case, in any vehicle.

5. Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 36E(a) states in pertinent part:

(a) *Issuance.*—A permit to carry a handgun shall be issued within a reasonable time by the Superintendent of the Maryland State Police, upon application under oath therefor, to any person whom he finds:

. . . .

(6) Has, based on the results of investigation, good and substantial reasons to wear, carry, or transport a handgun, provided however, that the phrase "good and substantial reason" as used herein shall be deemed to include a finding that such permit is necessary as a reasonable precaution against apprehended danger.

As we see it, the 1972 handgun control legislation does not address the unexpected and sudden circumstance when an individual is threatened with present, impending danger to his life or limb and as a consequence has no time to seek other protection. Furthermore, we cannot accept the contention that, in such circumstances, the General Assembly intended that the individual should succumb to his attacker and possibly forfeit his life rather than take possession of a handgun and act in self-defense. We find it entirely reasonable and consistent with § 36B's legislative purpose to conclude that when an individual finds himself in sudden, imminent danger of loss of life or serious bodily harm, or reasonably believes himself or others to be in such danger, and without preconceived design on his part a handgun comes into his possession, he may temporarily possess the weapon for a period no longer than the necessity or apparent necessity requires him to use it in self-defense. We therefore hold that necessity may be a defense to the charge of unlawful possession of a handgun.

A number of jurisdictions support our point of view. *See, e.g., People v. King,* 22 Cal.3d 12, 148 Cal.Rptr. 409, 582 P.2d 1000 (1978); *Mungin v. State,* 458 So.2d 293 (Fla.Dist. Ct.App.1984), *cert. denied,* 464 So.2d 556 (1985); *State v. Walton,* 311 N.W.2d 113 (Iowa 1981); *Duvall v. Commonwealth,* 593 S.W.2d 884 (Ky.App.1980) (by implication); *State v. Blache,* 480 So.2d 304 (La.1985); *State v. Spaulding,* 296 N.W.2d 870 (Minn.1980); *Osborne v. State,* 404 So.2d 545 (Miss.1981) (self-defense is defense to unlawful possession of a weapon); *State v. Hardy,* 60 Ohio App.2d 325, 397 N.E.2d 773 (1978); *Johnson v. State,* 650 S.W.2d 414 (Tex.Crim.App.1983); *State v. Nolan,* 700 F.2d 479 (9th Cir.), *cert. denied,* 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983); *United States v. Gant,* 691 F.2d 1159 (5th Cir.1982); *United States v. Agard,* 605 F.2d 665 (2d Cir. 1979).

In *United States v. Gant, supra,* two undercover police officers entered the front room of a store owned by the defendant, a convicted felon. The police officers offered to

sell Gant a .45 caliber machine gun. After Gant refused the offer, he went into the storage room to confer with one of his employees. Gant had been robbed a few weeks earlier and suspected that another robbery was in the making. He and his employee decided to evict the two men, and his employee suggested that Gant take the gun kept in the desk. Gant took the suggestion, and when he returned to the front room, with the butt of the gun sticking out of his pants pocket, he was arrested for unlawful possession of a firearm.[6] The trial court found that Gant had not acted under necessity and was thus guilty. *United States v. Gant*, 691 F.2d at 1162–63.

On appeal, the Fifth Circuit affirmed the lower court's decision and applied a four-part test to determine the validity of a necessity defense to the charge of unlawful possession of a handgun:

> [D]efendant must show (1) that defendant was under an unlawful and "present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury," (2) that defendant had not "recklessly or negligently placed himself in a situation in which it was probable that he would be [forced to choose the criminal conduct]," (3) that defendant had no "reasonable, legal alternative to violating the law, 'a choice both to refuse to do the criminal act and also avoid the threatened harm,'" and (4) "that a direct causal relationship may be reasonably anticipated between the [criminal] action and the avoidance of the [threatened] harm."

*Id.* (citations omitted) (brackets in original). *Accord United States v. Clark*, 741 F.2d 699, 704 (5th Cir.1984).

The *Gant* court found that the defendant did not satisfy the third and fourth elements. The court noted that Gant had a legal alternative to taking possession of the gun—he could have called the police. Moreover, although Gant's

---

**6.** Gant was charged with violating 18 U.S.C.App. § 1202(a)(1), which makes it unlawful for a convicted felon to possess a firearm.

possession of the gun made a robbery attempt less attractive, the court found that it did not eliminate the danger. *United States v. Gant, supra,* 691 F.2d at 1164–65.

The California Supreme Court has also devised a four-part test for the defense of necessity to illegal possession of a handgun. In *People v. King, supra,* the defendant, a convicted felon, was a guest at a party when a violent altercation broke out between the guests and a group of party crashers who had attempted to break down the front door. King was handed a gun by someone in the apartment, and he used it to defend himself and the others in the apartment. King was later charged with unlawful possession of a handgun.[7] The trial court refused to give a self-defense instruction to the jury and King was convicted. *People v. King, supra,* 22 Cal.3d at 16–20, 148 Cal.Rptr. at 410–13, 582 P.2d at 1002–04.

The California Supreme Court reversed the trial court and held that a citizen may legally possess a firearm for self-defense when: (1) the defendant "is in imminent peril of great bodily harm or reasonably believes himself or others to be in such danger," (2) "without preconceived design on his part a firearm is made available to him," (3) his temporary possession only persists until the necessity or apparent necessity dissipates, and (4) "no other alternative means of avoiding the danger are available." *Id.* at 24, 148 Cal.Rptr. at 416, 582 P.2d at 1007.

The court found that the defendant had a reasonable fear of imminent bodily harm and only used the gun, which he received without preconceived design, for a short period of time. The court therefore reversed the trial court on its refusal to give the defendant's requested instruction. *Id.* at 26–27, 148 Cal.Rptr. at 417–18, 582 P.2d at 1008–09.

We find these cases instructive and hold that necessity is a valid defense to the crime of unlawful posses-

---

7. King was charged with violating Cal.Penal Code § 12021, which prohibits convicted felons from carrying a concealable firearm.

sion of a handgun when five elements are present: (1) the defendant must be in present, imminent, and impending peril of death or serious bodily injury, or reasonably believe himself or others to be in such danger; (2) the defendant must not have intentionally or recklessly placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; (3) the defendant must not have any reasonable, legal alternative to possessing the handgun; (4) the handgun must be made available to the defendant without preconceived design, and (5) the defendant must give up possession of the handgun as soon as the necessity or apparent necessity ends. We emphasize that if the threatened harm is property damage or future personal injury, the defense of necessity will not be viable [8]; nor can the defense be asserted if the compulsion to possess the handgun arose directly from the defendant's own misconduct.

▇ Based on Crawford's testimony, he satisfies each element of the test. First, after being attacked and shot, Crawford wrestled the gun away from one of his assailants, and in so doing fell out of his second story apartment window. Crawford landed next to the gun. He heard footsteps coming from around the corner and picked up the gun to defend himself if the person or persons who had assaulted him in his apartment were pursuing him. Thus, Crawford had a reasonable belief that imminent peril was at hand. Second, Crawford did not intentionally or recklessly place himself in the predicament; he was attacked in his own apartment. Third, Crawford was wounded and dazed. Crawford had no opportunity to contact the police to seek

---

8. The Court of Special Appeals, in *Medley v. State,* 52 Md.App. 225, 448 A.2d 363, *cert. denied,* 294 Md. 544 (1982), held that a defendant charged with unlawful possession of a handgun under § 36B(b) is not entitled to a jury instruction "that a person who is not seeking a fight, but is reasonably apprehensive he might be attacked has a right to arm himself in anticipation of attack." As we have stated above, the gun control legislation passed by the General Assembly in 1972 eliminated any right to carry a handgun in anticipation of future harm. As such, the requested instruction was properly refused.

protection,[9] and neither retreating nor trying to talk to his assailants was a reasonable, legal alternative. Fourth, Crawford's possession of the handgun was merely fortuitous. The handgun was originally possessed by Crawford's assailant and only became available to him after he disarmed the assailant. Thus, Crawford had no preconceived design to gain possession of the handgun before being attacked. Fifth, after grabbing the handgun, Crawford crawled and staggered away from his apartment in an effort to reach safety, but his assailants continued to follow and shoot him. He surrendered the handgun when a police officer stood beside him so that he could see the officer's pants leg and thus be sure he was out of danger. Thus, if the jury believed Crawford's testimony on each of these points, a defense of necessity would have barred conviction.

As we have often said, "[i]t is incumbent upon the court, ... when requested in a criminal case, to give an ... instruction on every essential question or point of law supported by the evidence." *Bruce v. State*, 218 Md. 87, 97, 145 A.2d 428, 433 (1958); *e.g.*, *Smith v. State*, 302 Md. 175, 179, 486 A.2d 196, 198 (1985). Consequently, Crawford was entitled to a jury instruction on the defense of necessity to a violation of Art. 27, § 36B(b).

Lastly, we believe that common sense supports our decision. Justice Field, in *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 487, 19 L.Ed. 278 (1868) aptly stated:

> The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, "that whoever drew blood in the streets should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a

---

**9.** When Crawford was first attacked in his apartment, he picked up the telephone to call the police, but his service had been disconnected.

prisoner who breaks out when the prison is on fire—"for he is not to be hanged because he would not stay to be burnt." And we think that a like common sense will sanction the ruling we make, that the act of Congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder.

Similarly, we think it is common sense that the legislature could not have intended that a man, who has been attacked and shot and lies injured after falling from a window, cannot pick up a handgun that, as luck would have it, falls next to him when he hears what he believes are his aggressors in hot pursuit. It is utter folly to talk of requiring a man to get a permit to carry a handgun when threatened with death or serious bodily harm under such circumstances. Thus, we find that the trial court erred in failing to instruct the jury on the availability of the necessity defense, because if Crawford's version of the story is believed, his possession of the handgun was not unlawful.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PRINCE GEORGE'S COUNTY TO PAY THE COSTS.